UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                     :

SPIN MASTER LTD.,                                :

                              Plaintiff,        :

                                      :       Civil Action No. 08-cv-0923

                     -against-          :       (RJA) (HKS)

                                      :

BUREAU VERITAS CONSUMER PRODUCTS     :
SERVICES, INC., and EUROFINS PRODUCT      :
SAFETY LABS, INC.                          :

                                      :
                        Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANT EUROFINS PRODUCT SAFETY LABS, INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF
SPIN MASTER LTD.'S MOTION FOR A PROTECTIVE ORDER
AND SPIN MASTER LTD.'S AND RONALD Y. ROTHSTEIN'S
<u>AMENDED MOTION TO QUASH NON-PARTY SUBPOENA</u>**


                            KASOWITZ, BENSON, TORRES
                               & FRIEDMAN LLP
                            *Attorneys for Defendant*
                            *Eurofins Product Safety Labs, Inc.*
                            1633 Broadway
                            New York, New York 10019
                            (212) 506-1700

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ............................................................................................................... 3

A.    SPIN MASTER'S RELEVANT ALLEGATIONS IN THIS ACTION ........................... 3

B.    SPIN MASTER'S CONTRARY CONTENTIONS TO THE CPSC ............................... 4

C.    THE DISCOVERY SOUGHT .................................................................................... 7

ARGUMENT  THE DEPOSITION IS RELEVANT AND REASONABLY
         CALCULATED TO LEAD TO THE DISCOVERY OF ADMISSIBLE
         EVIDENCE, AND THERE IS NO APPLICABLE EXCEPTION TO THE
         GENERAL RULE THAT WARRANTS A PROTECTIVE ORDER .............................. 8

A.    THE DEPOSITION OF MR. ROTHSTEIN IS APPROPRIATE HERE BASED
         ON CONTROLLING LAW ....................................................................................... 8

         1.    Factor 1: EPSL Has A Demonstrable Need To Depose Mr. Rothstein ................. 9

               a.    The Information Sought Is Relevant .......................................................... 9

               b.    Mr. Rothstein Is Privy To The Facts He Communicated To The
                      CPSC And He Is A Necessary Witness .................................................... 10

         2.    Factor 2:  Mr. Rothstein Plays An Integral Role In The CPSC Letters, And
               The Deposition Sought Is Not Based On His Role As Counsel In This
               Case .................................................................................................................... 13

         3.    Factor 3: There Is No Privilege Issue ................................................................. 15

               a.    This Issue Has Been Resolved Conclusively ........................................... 15

               b.    Privilege/Work Product Has Been Waived ............................................... 15

               c.    Mr. Rothstein's CPSC Communications Are Not Privileged As A
                      Substantive Matter ................................................................................... 16

         4.    Factor 4:  Extent Of Discovery So Far Does Not Obviate The Deposition ........ 17

B.    SPIN MASTER'S ACCUSATION OF IMPROPRIETY IS WHOLLY
         UNSUBSTANTIATED ............................................................................................. 20

C.    SEVENTH CIRCUIT LAW DOES NOT PRECLUDE THE DEPOSITION ............... 20

CONCLUSION ................................................................................................................. 23

### TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

<u>Astra Aktiebolag v. Andrx Pharms., Inc.</u>,
    208 F.R.D. 92 (S.D.N.Y. 2002) ................................................................................21

<u>Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.</u>,
    95 Civ. 8833, 1999 U.S. Dist. LEXIS 8929 (S.D.N.Y. June 14, 1999).....................18

<u>Creditsights, Inc. v. Ciasullo</u>,
    05 Civ. 9345, 2009 WL 3821441 (S.D.N.Y. Nov. 6, 2009) .......................................9

<u>D'Andrea v. Hulton</u>,
    81 F. Supp. 2d 440 (W.D.N.Y. 1999) .......................................................................15

<u>Disability Advocates, Inc. v. Paterson</u>,
    03-CV-3209, 2008 U.S. Dist. LEXIS 103310 (E.D.N.Y. Dec. 22, 2008) ...............16

<u>Dove v. Atlantic Capital Corp.</u>,
    963 F.2d 15 (2d Cir. 1992)..........................................................................................8

<u>Genal Strap, Inc. v. Dar</u>,
    CV 2004-1691, 2006 U.S. Dist. LEXIS 11474 (E.D.N.Y. Mar. 3, 2006) ...........8, 16

<u>Gragg v. International Management Group, Inc.</u>,
    5:03-CV-0904, 2007 WL 1074894 (N.D.N.Y. Apr. 5, 2007)....................................14

<u>Holman v. ICN Pharm., Inc.</u>,
    98 Civ. 0674, 1999 U.S. Dist. LEXIS 20017 (S.D.N.Y. Dec. 29, 1999)..................19

<u>In re Friedman</u>,
    350 F.3d 65 (2d Cir. 2003)............................................................................... passim

<u>In re Initial Pub. Offering Sec. Litig.</u>,
    249 F.R.D. 457 (S.D.N.Y. 2008) .........................................................................16, 17

<u>In re Ski Train Fire</u>,
    343 F. Supp. 2d 208 (S.D.N.Y. 2004)........................................................................20

<u>In re Steinhardt Partners, L.P.</u>,
    9 F.3d 230 (2d Cir. 1993)...........................................................................................16

<u>Litton Systems, Inc. v. Am. Tel. & Tel. Co.</u>,
    700 F.2d 785 (2d Cir. 1983)........................................................................................19

<u>Mislin v. City of Tonawanda Sch. Dist.</u>,
    02-CV-273S, 2004 U.S. Dist. LEXIS 21774 (W.D.N.Y. Oct. 27, 2004) .................17

Murata Manufacturing Co., Ltd. v. Bel Fuse Inc.,
 M8-85, 2007 U.S. Dist. LEXIS 97126 (S.D.N.Y. Apr. 19, 2007)....................................11, 12

New York Independent Contractors Alliance, Inc. v. Highway, Road and Street
 Construction Laborers Local Union 1010,
 07-CV-1830, 2008 U.S. Dist. LEXIS 95328 (E.D.N.Y. Nov. 24, 2008).........................13, 14

Qad.inc v. ALN Associates, Inc.,
 132 F.R.D. 492 (N.D. Ill. 1990)...............................................................................................22

Sea Tow International, Inc. v. Pontin,
 246 F.R.D. 421 (E.D.N.Y. 2007) ............................................................................... 13, 14-15

Shelton v. American Motors Corp.,
 805 F.2d 1323 (8th Cir. 1986) .........................................................................................21, 22

Srail v. Vill. of Lisle,
 07 C 2617, 2007 U.S. Dist. LEXIS 92363 (N.D. Ill. Dec. 12, 2007) ......................................22

Tailored Lighting, Inc. v. Osram Sylvania Products, Inc.,
 255 F.R.D. 340 (W.D.N.Y. 2009)..........................................................................9, 11, 18, 21

Texaco Inc. v. Pennzoil Co.,
 784 F.2d 1133 (2d Cir. 1986)..................................................................................................20

United States v. Yonkers Board of Education,
 946 F.2d 180 (2d Cir. 1991).....................................................................................................9

Upjohn Co. v. United States,
 449 U.S. 383 (1981)................................................................................................................16

Urban Box Office Network, Inc. v. Interfase Managers, L.P.,
 01 Civ. 8854, 2004 U.S. Dist. LEXIS 21229 (S.D.N.Y. Oct. 19, 2004) ...........................15, 16

Wilson v. O'Brien,
 07 C 3994, 2010 U.S. Dist. LEXIS 33721 (N.D. Ill. Apr. 6, 2010) ........................................22

**Statutes**

15 U.S.C. § 2064(b) ...................................................................................................................4

Federal Hazardous Substances Act, 15 U.S.C. §§ 1261-1278........................................................4

**Rules**

16 CFR 1500.3(2)(c)..................................................................................................................6

16 CFR 1500.3(2)(c)(i) ..............................................................................................................6

16 CFR 1500.3(b)(5)...........................................................................................................................6

Fed. R. Civ. P. 26(b)(1)......................................................................................................................8

Fed. R. Civ. P. 30(a)(1)......................................................................................................................8

Defendant Eurofins Product Safety Labs, Inc. ("EPSL") submits this memorandum of law in opposition to Plaintiff's ("Spin Master") motion for a protective order, as well as Spin Master's and Ronald Y. Rothstein's amended motion to quash non-party subpoena simultaneously filed in the U.S. District Court for the Northern District of Illinois.[1]

PRELIMINARY STATEMENT

In a nutshell, this action is centered around Spin Master's allegation that all its woes regarding Aqua Dots are to be blamed on Bureau Veritas and EPSL because supposedly Bureau Veritas/EPSL failed to discern that the provided test sample was toxic.  EPSL has a number of defenses to this case, and among them is that, in fact, based on the very specific (and only) regulatory acute oral toxicity test EPSL was asked to do, the sample provided simply was not toxic based on the relevant standard.  Thus, the question of toxicity is a hotly disputed issue in this case — Spin Master argues the sample was toxic, and EPSL argues that it was not.

Against this backdrop, Spin Master finally produced, only after having been compelled by an order of the court hearing the product liability claims against it, communications it had with the CPSC concerning Aqua Dots (Spin Master resisted production on the grounds of privilege, and that objection was overruled).  Those documents include two letters from Spin Master to the CPSC in which Spin Master asserts that Aqua Dots, in fact, is not toxic, and that the applicable acute oral toxicity test called for under the CFR demonstrates as much. Essentially, while arguing here that Aqua Dots is toxic and EPSL came to the wrong conclusion, Spin Master simultaneously was asserting to the United States governmental agency charged with overseeing the safety of these products that Aqua Dots is not toxic and the acute oral

---

[1]     The U.S. District Court for the Northern District of Illinois transferred the motion to quash to this Court.  See Transfer Order, a copy of which is annexed to the Declaration of Dorit Ungar dated February 18, 2011 ("Ungar Decl.") as Exhibit A.

toxicity test shows as much.  In other words, Spin Master is taking diametrically opposed factual positions in this case than it is taking with the government, and it is doing so at the exact same time (one of the letters to the CPSC was sent during the pendency of this litigation).  Needless to say, these two letters are powerful evidence, and the propriety of a deposition of the author is hard to question.

As it happens, Mr. Rothstein is the author of these two letters.  That Spin Master chose to have its outside lawyer take the factual positions at issue does not insulate the author from discovery.  Indeed, had Spin Master's general counsel (or any other employee or agent) written the letters, there would be no question that Defendants could depose that person.  There is no basis for reaching a different conclusion simply because Spin Master, of its own volition, chose to have its outside lawyer aver the facts to the CPSC.  Moreover, there is little doubt that Defendants will use these letters at trial, and presumably Spin Master will try to proffer some argument why the letters should not be taken at face value.  Defendants are entitled to learn in discovery whatever position Spin Master is going to take at trial, and the place to start is with the author.  We appreciate fully that the situation is somewhat awkward because Spin Master chose to have its outside counsel make the factual representations at issue, but Spin Master cannot avoid plainly proper discovery simply by having its lawyer be the front man.  Mr. Rothstein surely will be arguing to the Court and/or jury his view of his letters and why he thinks they do not have the import Defendants attach to them, and it would be fundamentally unfair to deny Defendants the ability to depose Mr. Rothstein in advance of trial on that very topic.

<u>BACKGROUND</u>

A.    <u>Spin Master's Relevant Allegations In This Action</u>

In April 2007, Spin Master began distributing Aqua Dots in the United States.  (Ungar Decl. Ex. B (Spin Master Admissions) No. 17)  In June 2007, some two months *after* Spin Master had begun distributing Aqua Dots to the public, Spin Master first engaged Defendant Bureau Veritas Consumer Products Services, Inc. ("<u>Bureau Veritas</u>") to "conduct acute oral ingestion toxicity testing, using live animals, on a sample of Aqua Dots beads."  (Amended Complaint, D.E. 7 ("Am. Compl.") ¶ 12)  Bureau Veritas in turn engaged EPSL and was very specific in what it hired EPSL to do:  "Test Requested: 16 CFR 1500.3(c)(2)(i) Oral Toxicity." (Ungar Decl. Ex. C (Test Request Form) at SP228500)  EPSL performed the test and provided a written report to Bureau Veritas.  (Am. Compl. ¶ 15)  Using EPSL's findings, Bureau Veritas then prepared its own report with its own conclusions, and submitted those conclusions to Spin Master on August 10, 2007.  (<u>Id.</u>)  Bureau Veritas' report stated that "the Aqua Dots beads were found to 'not be[] toxic' under United States federal toy regulations for acute oral toxicity."  (<u>Id.</u>) At all relevant times, Spin Master communicated exclusively with Bureau Veritas and had no contact with EPSL (EPSL was unaware that the test it was asked to do was for Spin Master or that the product was Aqua Dots, as it was a blind test).  (Ungar Decl. Ex. D (Spin Master Interrogatory answers) Nos. 2, 3)  It was not until October 11, 2007, roughly six months *after* Spin Master was already selling Aqua Dots into the market, that Spin Master received for the first time from Bureau Veritas a copy of the EPSL test report.  (<u>Id.</u> at Nos. 3, 11)  Less than a month later, on November 7, 2007, Spin Master recalled Aqua Dots. (Am. Compl. ¶¶ 1, 19)

As its basis for this lawsuit, Spin Master alleges that EPSL's "test was useless as a test for toxicity of the craft beads" (Am. Compl. ¶ 24), that EPSL "was aware … that a report that the

beads were safe and not toxic would be relied upon in placing the Aqua Dots beads into the

stream of commerce to be sold for use by children" (Am. Compl. ¶ 41), that "Spin Master relied

on … the [EPSL] report in continuing to distribute and sell Aqua Dots" (Am. Compl. ¶ 18), that

had EPSL "exercised due care relating to the animal testing of Aqua Dots beads, the results of

the testing would have led quickly to the discovery of 1,4 butanediol in the beads and its effect

on humans" (Am. Compl. ¶ 47), and that had EPSL "acted with the appropriate level of

professional care … the November 7, 2007 recall of all Aqua Dots beads would have been

avoided, and the Aqua Dots beads would have been replaced before the upcoming holiday

shopping season." (Am. Compl. ¶ 33)

Spin Master's assertions badly mischaracterize the facts and ignore the evidence, but

regardless, the upshot is that Spin Master alleges as the basis for its claims in this case that Aqua

Dots was toxic, and Bureau Veritas/EPSL failed to figure that out.

B.   Spin Master's Contrary Contentions To The CPSC

Several months after the recall, the CPSC began "investigating whether [Spin Master] …

complied with the Federal Hazardous Substances Act, 15 U.S.C. §§ 1261-1278 ('FHSA') and the

reporting requirements of section 15(b) of the Consumer Product Safety Act ('CPSA'), 15

U.S.C. § 2064(b),[2] concerning the Aqua Dots recalled on November 7, 2007[.]"  (Ungar Decl.

---

[2]      Section 15(b) of the CPSA required Spin Master to "notify the [CPSC] immediately if it
obtains information which reasonably supports the conclusion that a product distributed in
commerce (1) fails to meet a consumer product safety standard or banning regulation, (2)
contains a defect which could create a substantial product hazard to consumers, (3) creates an
unreasonable risk of serious injury or death, or (4) fails to comply with a voluntary standard
upon which the Commission has relied under the CPSA." (CPSC Recall Handbook, available at
http://www.cpsc.gov/businfo/8002.html#Sec15)  If necessary, the CPSC "evaluates whether or
when a firm should have reported," which "evaluation will be based, in part, on what the
company actually knew about the hazard posed by the product or **on what a reasonable person,
acting under the circumstances, should have known about the hazard while exercising due
care.**"  (Id., emphasis in original.)

Ex. E (August 19, 2008 CPSC Letter) at 1)  As part of its investigation, the CPSC asked Spin

Master to respond to a series of requests for information and documents.  (Id.)  Spin Master

responded in a series of letters, two of which are relevant here — an October 17, 2008 letter, and

a June 19, 2009 letter.  These letters are relevant to this motion because they contain statements

that contradict allegations Spin Master asserts in this case as the very basis for its claims.  (Ungar

Decl. Ex. F (October 17, 2008 letter) and Ex. G (June 19, 2009 letter))[3]

Spin Master's June 19, 2009 letter to the CPSC contains the following assertions:

Redacted

(Ungar Decl. Ex. G (June 19, 2009 letter) at 3, 4)

Spin Master's October 17, 2008 letter contains the following assertions:

Redacted

---

[3]      Spin Master filed the October 17, 2008 and June 19, 2009 letters under seal.  EPSL does not agree that these letters or other materials referenced as exhibits meet the requirements of the Stipulated Protective Order, D.E. 74, considering that, among other things, the materials are correspondence with the CPSC which may be released to the public in response to a FOIA request.  Solely to avoid a fight, EPSL will file these materials under seal and redact those portions of this brief that quote from such materials.  EPSL reserves the right to contest Spin Master's confidentiality designations.

# Redacted

(Ungar Decl. Ex. F (October 17, 2008 letter) at 27, 35, emphasis added)

The assertions in these two letters are at odds with Spin Master's position in this action that Aqua Dots was toxic, and thus EPSL was negligent and grossly negligent for failing to detect as much.  Notably, in explaining to the CPSC why Aqua Dots is not toxic, Spin Master refers to both 16 CFR 1500.3(2)(c) and 16 CFR 1500.3(b)(5).  (Ungar Decl. Ex. G (June 19, 2009 letter) at 3)  The magnitude of this cannot be ignored:

1. 16 CFR 1500.3(2)(c)(i) is the very (and only) provision under which EPSL was tasked to and conducted the acute oral toxicity test at issue in this litigation.  (Ungar Decl. Ex. C (Bureau Veritas Test Request Form To EPSL at SP228500 and EPSL Test Report at SP228499))

2. 16 CFR 1500.3(b)(5) is a provision that Spin Master, in the context of this litigation only, tries to use to make an argument that the sample given to Bureau Veritas (and then to EPSL) is in fact toxic (notwithstanding that EPSL was not asked to perform a test under this provision, and everyone, including Spin Master's non-testifying expert, now agrees that EPSL's conclusion was correct under the provision it was asked to address).

Thus, while arguing to this Court that the Aqua Dots sample was toxic under 16 CFR 1500.3(2)(c)(i) and 16 CFR 1500.3(b)(5), Spin Master was arguing simultaneously to the CPSC that the sample was *not* toxic under those exact same provisions.  Of particular relevance is that these are not a couple of stale letters written years ago before Spin Master knew the facts — the June 19, 2009 letter was written *after* Spin Master commenced this case and made its assertions here about Aqua Dots' toxicity, and the October 17, 2008 letter was written only a few months before Spin Master sued (indeed, the letters bring into question the good faith basis for this case).

Putting aside the issue of toxicity, the June 19, 2009 letter also contradicts Spin Master's assertion in this action that it relied on EPSL's test report in making the decision to continue to distribute and sell Aqua Dots:

## Redacted

(Ungar Decl. Ex. G (June 19, 2009 letter) at 5) (emphasis added)

Based on these statements, it appears Spin Master's decision to continue distributing and selling Aqua Dots was based on reports by MJN Associates dated October 25, 2007, Intertek Testing Services Hong Kong, Ltd. dated October 29 and 30, 2007, and Chemir Analytical Services dated October 31, 2007 (see Ungar Decl. Ex. F (October 17, 2008 letter) at 20-23), rather than the August 10, 2007 EPSL test report which Spin Master did not receive until October 11, 2007, six months after it already was selling the product to the market. Nevertheless, Spin Master maintains a contrary position as the basis for its claims here.

C.      The Discovery Sought

The above description makes plain that the two letters at issue are relevant, and Spin Master does not even argue otherwise.  In the ordinary course, Defendants, as would any party, seek to depose the author.  Here, however, Spin Master resists that deposition because the author happens to be its outside lawyer.  As discussed below, Spin Master cannot insulate itself from

7

discovery because it chose to have its outside lawyer make factual representations and assertions to the CPSC that now prove to be inconvenient in the context of this case.

<u>ARGUMENT</u>

<u>THE DEPOSITION IS RELEVANT AND REASONABLY CALCULATED TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE, AND THERE IS NO APPLICABLE EXCEPTION TO THE GENERAL RULE THAT WARRANTS A PROTECTIVE ORDER</u>

It is well-settled that the Federal Rules of Civil Procedure envision a liberal discovery regime, allowing parties to obtain discovery "regarding *any* nonprivileged matter that is relevant to any party's claim or defense[.]" FED. R. CIV. P. 26(b)(1) (emphasis added). Likewise, the rules provide that, generally, "[a] party may, by oral questions, depose *any* person, including a party, without leave of court[.]" FED. R. CIV. P. 30(a)(1) (emphasis added). Because the federal rules contemplate a broad and permissive discovery system, the burden of persuasion for a protective order limiting such discovery must be borne by the moving party. <u>See, e.g.</u>, <u>Dove v. Atlantic Capital Corp.</u>, 963 F.2d 15, 19 (2d Cir. 1992) ("Where . . . the [discovery is] relevant, the burden is upon the party seeking non-disclosure or a protective order to show good cause.") (internal quotation marks omitted, brackets in original); <u>Genal Strap, Inc. v. Dar</u>, CV 2004-1691, 2006 U.S. Dist. LEXIS 11474, at *3 (E.D.N.Y. Mar. 3, 2006).

Here, Spin Master does not contest that the deposition of the author of the relevant letters normally would be permissible and appropriate. Instead, it claims that the deposition should not be allowed for the sole reason that the author happens to be Spin Master's outside lawyer. That is not a basis to stymie legitimate discovery under the circumstances present here.

A.      <u>The Deposition Of Mr. Rothstein Is Appropriate Here Based On Controlling Law</u>

According to the Second Circuit, and contrary to the impression Spin Master seeks to give, "the fact that the proposed deponent is a lawyer does not automatically insulate him or her

from a deposition nor automatically require prior resort to alternative discovery devices." In re Friedman, 350 F.3d 65, 72 (2d Cir. 2003). In re Friedman is a watershed case, as the Second Circuit held that "the deposition-discovery regime of the Federal Rules of Civil Procedure requires a more flexible approach to attorney depositions" than the more rigid rule that courts had previously applied. Id. at 67. It is worthy of note that Spin Master's authorities are the very ones the Second Circuit rejected in In re Friedman.[4]

In any event, via In re Friedman the Second Circuit established a four-part test that courts in this Circuit use to evaluate attorney depositions: (i) the need to depose the lawyer, (ii) the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, (iii) the risk of encountering privilege and work-product issues, and (iv) the extent of discovery already conducted. In re Friedman, 350 F.3d at 72.

> 1.    Factor 1: EPSL Has A Demonstrable Need To Depose Mr. Rothstein

> > a.    The Information Sought Is Relevant

Courts weighing the Friedman factors refer to the relevancy standards of the Federal Rules. See, e.g., Tailored Lighting, Inc. v. Osram Sylvania Products, Inc., 255 F.R.D. 340, 343 (W.D.N.Y. 2009) (applying the Friedman factors and holding "[t]he threshold requirement of discoverability under the Federal Rules of Civil Procedure is whether the information sought is relevant to any party's claim or defense. To be discoverable, the information need not be

---

[4]    For instance, Spin Master relies on United States v. Yonkers Board of Education, 946 F.2d 180, 185 (2d Cir. 1991), for the general premise that "depositions of opposing counsel are disfavored." This case has been superseded by In re Friedman, as has been noted by other cases. See Creditsights, Inc. v. Ciasullo, 05 Civ. 9345, 2009 WL 3821441, at *1 n.1 (S.D.N.Y. Nov. 6, 2009) ("We note that plaintiff relies on what appears to be outdated dictum from *United States v. Yonkers Bd. of Educ.*, 946 F.2d 180 (2d Cir. 1991). For a more updated dictum, which eschews prior seeming reliance on *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986), we refer to the Second Circuit's analysis in *Dennis Friedman*.").

9

admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence") (internal citations and quotation marks omitted).

There can be little doubt that the deposition sought is relevant.  Spin Master's claims in this case center on its contention that Aqua Dots was toxic, Defendants were negligent in failing to detect such toxicity, and Spin Master relied on the "not toxic" conclusions in deciding to sell the product.  Throughout the course of the CPSC's investigation into how Spin Master handled the Aqua Dots situation, however, Mr. Rothstein authored several letters asserting as a factual matter that, among other things, (i) Aqua Dots was not toxic, (ii) Spin Master relied on a number of tests and entities other than Bureau Veritas and EPSL in deciding to sell Aqua Dots and keep it on the market, and (iii) every other testing company Spin Master used also concluded that the sample was not toxic under the relevant regulations, thereby belying the notion that EPSL's and Bureau Veritas' similar finding was negligent.  These topics are not merely tangentially relevant to this case; rather, they go to the very core of the factual disputes in this litigation.

> b.   Mr. Rothstein Is Privy To The Facts He Communicated
>       To The CPSC And He Is A Necessary Witness

Spin Master argues that Mr. Rothstein's deposition is not necessary because "[h]e was not involved in the recall of Aqua Dots, [and] he is not a witness to any of the events concerning the recall [...]."  (Spin Master Memorandum of Law, D.E. 102-1 ("Spin Master Br.") at 4)  This misses the point.  EPSL is unconcerned with Mr. Rothstein's role in the recall.  Mr. Rothstein authored at least two letters that he sent to the CPSC in which he makes various factual assertions that are devastating to Spin Master's case here.  Mr. Rothstein plainly has knowledge about those statements, otherwise he would not have been able to make them (presumably he did not simply make up these facts, but even if he did, that would be something Defendants would be entitled to learn at his deposition).

10

Equally unavailing is Spin Master's contention that Mr. Rothstein lacks firsthand knowledge of the facts he averred to the CPSC.  (Spin Master Br. at 6)  Aside from being questionable (as noted, presumably Mr. Rothstein had some basis for making factual representations to the United States government), the lack of "firsthand knowledge" is not a bar to a deposition.  See Tailored Lighting, 255 F.R.D. at 345.  Contrary to Spin Master's assertions (Spin Master Br. at 8 n.3), the facts of Tailored Lighting are analogous to those present here.  In that case, defendant Sylvania moved for a protective order precluding plaintiff from deposing Sylvania's in-house counsel, Mitchell, in a case involving allegations of patent infringement that pre-dated Mitchell's employment as in-house counsel.  Id. at 343, 345.  Much like Mr. Rothstein, who on behalf of Spin Master provided information to the CPSC in response to its requests for information, Mitchell on behalf of Sylvania provided interrogatory responses.  Id.  In determining the need for Mitchell's deposition, the court recognized the interest in exploring the bases for Sylvania's interrogatory responses, and overruled Sylvania's objection that plaintiff should be relegated to deposing all individuals who may have assisted Mitchell in preparing the interrogatory responses (pretty much the argument Spin Master makes here).  Id. at 345.  Significantly, the court stated that Mitchell "appear[ed] to be the only witness who could testify to the myriad bases for [his client]'s interrogatory responses," and "[a]lthough his responses are not likely to be based on firsthand knowledge, that limitation alone should not preclude [plaintiff] from examining in the most effective way possible the sources of information upon which the answers are based."  Id. at 345.  Balancing the pertinent Friedman factors, the court concluded that Mitchell should be deposed.  Id. at 346.

Notwithstanding Spin Master's argument that EPSL should first seek information on the subpoena topics from Spin Master employees or through written discovery, Mr. Rothstein "can

11

certainly offer unique information given his primary role in the subject of each [deposition]
topic." Murata Manufacturing Co., Ltd. v. Bel Fuse Inc., M8-85, 2007 U.S. Dist. LEXIS 97126,
at *3, *4 (S.D.N.Y. Apr. 19, 2007) (permitting deposition of litigation counsel).  It would be
utterly unfair if Spin Master were allowed to immunize itself from discovery simply by choosing
to provide facts to the CPSC through its counsel.  This is especially true considering that Spin
Master was not obligated to communicate with the CPSC through counsel, much less outside
counsel.  Mr. Rothstein was or should have been aware that by taking on the role as his client's
spokesperson vis-à-vis the United States government in a non-lawsuit setting, he made himself a
fact witness, and Spin Master made that choice at its own risk.[5]  As the court held in Murata,
"[defendant] should not be able to avoid inquiry into a relevant subject by choosing for trial the
same attorney who provided the advice-of counsel Opinion on which the party relies.  Attorneys
with discoverable facts, not protected by attorney-client privilege or work product,[6] are not
exempt from being a source for discovery by virtue of their license to practice law or their
employment by a party to represent them in litigation."  Id. at *5 (internal citations and quotation
marks omitted).

Moreover, Mr. Rothstein appears to be one of the only (if not *the* only) Spin Master
witness from whom Defendants can take testimony on these factual representations made to the
CPSC, as it appears no one else at Spin Master made such factual representations to the CPSC.
And even if there turns out to be another witness that has relevant knowledge, that does not

---

[5]     In that context, it bears mentioning that Mr. Rothstein does not state in his letters that he
merely is passing on facts of which he lacks knowledge.  Quite obviously, the CPSC would not
have accepted a letter stating that the author has no idea if any of the facts asserted are true.  Spin
Master cannot use Mr. Rothstein as the proverbial sword by having him assert facts when
needed, but then use him as a shield to disavow personal knowledge when the factual assertions
become inconvenient.

[6]     As discussed below, *infra* at 15-17, there is no privilege issue here.

obviate the need to take testimony from Mr. Rothstein.  Clearly there is going to be a credibility

fight on these points, so having favorable testimony from Mr. Rothstein is going to be critical in

rebutting the contrary positions Spin Master is asserting in this case.

2.      Factor 2:  Mr. Rothstein Plays An Integral Role In The CPSC Letters,
        And The Deposition Sought Is Not Based On His Role As Counsel In This Case

There is no arguing about whether Mr. Rothstein had a role in the matters to be covered

at the deposition, as he is the author of the very letters at issue, and as such, he is right at the

center of the matters to be addressed.  While it is also true that Mr. Rothstein is Spin Master's

counsel in this case, the deposition has nothing to do with his role in that regard, and there will

be no questions about his conduct or actions in this case.  The deposition will be limited to his

involvement in the CPSC investigation and related matters outside of this case.

Spin Master cites Sea Tow International, Inc. v. Pontin, 246 F.R.D. 421 (E.D.N.Y. 2007)

for the proposition that Mr. Rothstein's role as trial counsel weighs against permitting his

deposition.  (Spin Master Br. at 9)  That case is easily distinguishable.  In Sea Tow, the court did

not allow the deposition because it found that the testimony sought concerned only the attorney's

role as legal counsel and his legal advice, not any facts of which the lawyer might have had

knowledge.  Id. at 427.  Here, of course, Mr. Rothstein averred various relevant facts to the

CPSC (i.e., what Spin Master relied upon in selling and keeping Aqua Dots on the market, and

whether Aqua Dots is toxic).  The deposition does not concern Mr. Rothstein's legal advice to

Spin Master, as was the case for the deposition sought in Sea Tow.

Similarly distinguishable is New York Independent Contractors Alliance, Inc. v.

Highway, Road and Street Construction Laborers Local Union 1010, 07-CV-1830, 2008 U.S.

Dist. LEXIS 95328 (E.D.N.Y. Nov. 24, 2008), another case Spin Master relies upon.  (Spin

Master Br. at 7)  That case concerned whether a collective bargaining agreement had been

renewed before a date certain, but the lawyer letters giving rise to the request for the deposition all were written long after the applicable timeframe and did not reflect any facts that the lawyer might have known; rather, the letters constituted legal argument about why the collective bargaining agreement supposedly renewed automatically.  Id. at *10-11, *21-22.

Spin Master also cites Gragg v. International Management Group, Inc., 5:03-CV-0904, 2007 WL 1074894, at *9, *10 (N.D.N.Y. Apr. 5, 2007) in its sections regarding the first and second Friedman factors.  (Spin Master Br. at 8, 9)  First, plaintiff sought to depose the adversary lawyer concerning compliance with outstanding discovery requests, not factual knowledge gained outside of the litigation.  Id. at *10.  Second, and more importantly, Spin Master fails to disclose that the Gragg decision came with a critical comment that guts the basis for which Spin Master cites the case.  The court noted that its "ruling regarding [the attorney] is limited to the matters which plaintiff announced he would be seeking to explore in her deposition.  To the extent that [she] may possess *factual information* that is not privileged and is relevant to the claims and defenses in the action, the court might take a different view regarding her deposition."  Id. at *10 n.14 (emphasis added).

In contrast to the scenarios present in Spin Master's cited cases, EPSL wishes to examine Mr. Rothstein not about his role as Spin Master's legal counsel in this action or anything he did or said in such role, but about his role as Spin Master's mouthpiece to the CPSC through which Spin Master chose to make various factual assertions.  Wearing his CPSC hat, Mr. Rothstein made factual assertions that are relevant to key issues in this action and that are not in accord with the position Spin Master maintains in the present case.  EPSL is interested only in exploring these inconsistent factual assertions, not any "legal opinions, conclusions [or] interpretations" Mr. Rothstein may have provided to Spin Master in his role as trial counsel.  See, e.g., Sea Tow,

14

246 F.R.D. at 426.  In other words, Mr. Rothstein's position as Spin Master's trial counsel is irrelevant to the discovery EPSL seeks.

      3.    <u>Factor 3: There Is No Privilege Issue</u>

          a.    <u>This Issue Has Been Resolved Conclusively</u>

Though Spin Master argues that the deposition would "impermissibly encroach on the attorney-client privilege and work product doctrine" (Spin Master Br. at 10), Spin Master fails to disclose that it already litigated this issue and lost, so there is no privilege concern.  Initially, Spin Master refused to produce its communications with the CPSC in the underlying products liability multi-district litigation case, arguing privilege and work product protection.  That issue was litigated fully, Spin Master lost, and the MDL court ruled that the materials and information are not privileged or protected, and to the extent they ever were, such protections were waived. (Ungar Decl. Ex. H (MDL Order) at 7-8, 9, 14)  That decision is the end of the inquiry, and Spin Master has no legitimate basis to try to argue privilege over again here.  <u>See, e.g.</u>, <u>Urban Box Office Network, Inc. v. Interfase Managers, L.P.</u>, 01 Civ. 8854, 2004 U.S. Dist. LEXIS 21229, at *16 (S.D.N.Y. Oct. 19, 2004) ("waiver of the privilege in one case renders it unavailable in later cases"); <u>D'Andrea v. Hulton</u>, 81 F. Supp. 2d 440, 443 (W.D.N.Y. 1999) ("[T]he doctrine of collateral estoppel (or 'issue preclusion') precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party . . . whether or not the tribunals or causes of action are the same.") (internal quotation marks omitted).

          b.    <u>Privilege/Work Product Has Been Waived</u>

As noted, Spin Master already litigated and lost the privilege issue.  As a result, it produced to Defendants in this case the letters at issue, as well as other communications Spin Master had

with the CPSC.  In addition to the conclusive ruling in the MDL case that effectively ends the

issue, that Spin Master produced the materials here knowingly, and has not sought to recapture

them as an inadvertent disclosure (in light of the MDL decision and the reason Spin Master

produced, obviously the disclosure was not inadvertent), to the extent there could be an argument

that somehow the MDL decision is not conclusive, Spin Master nevertheless has waived any

privilege by voluntarily producing the materials to Defendants in this case.  See, e.g., Urban Box

Office Network, Inc. v. Interfase Managers, L.P., 01 Civ. 8854, 2004 U.S. Dist. LEXIS 21229, at

*9 (S.D.N.Y. Oct. 19, 2004) ("privilege is waived if the holder of the privilege voluntarily

discloses or consents to disclosure of any significant part of the communication to a third party

or stranger to the attorney-client relationship.").

Likewise, to the extent the communications or work ever was privileged, as the MDL

court found, it was waived once Spin Master gave it to the CPSC, an adversary.  See In re

Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993) ("The waiver doctrine provides that

voluntary disclosure of work product to an adversary waives the privilege as to other parties.");

In re Initial Pub. Offering Sec. Litig., 249 F.R.D. 457, 466 (S.D.N.Y. 2008) (adversarial

relationship between defendant and investigating government agencies meant defendant waived

privileges by disclosing memoranda to such agencies during the course of investigations).

     c.    Mr. Rothstein's CPSC Communications
             Are Not Privileged As A Substantive Matter

It is well-accepted that while attorney-client communications are subject to protection,

"underlying facts do not become privileged simply because they were transmitted from client to

attorney."  Genal Strap, Inc. v. Dar, CV 2004-1691, 2006 U.S. Dist. LEXIS 11474, at *10

(E.D.N.Y. Mar. 3, 2006) (citing Upjohn Co. v. United States, 449 U.S. 383, 395-96 (1981)); see

also Disability Advocates, Inc. v. Paterson, 03-CV-3209, 2008 U.S. Dist. LEXIS 103310, at *56

(E.D.N.Y. Dec. 22, 2008) ("The Supreme Court has held that the attorney-client privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney.") (internal quotation marks omitted); Mislin v. City of Tonawanda Sch. Dist., 02-CV-273S, 2004 U.S. Dist. LEXIS 21774, at *5 (W.D.N.Y. Oct. 27, 2004) (same). EPSL wishes to examine Mr. Rothstein about the factual assertions he made to the CPSC. Even if these facts were communicated to him by Spin Master, attorney-client privilege does not attach to such facts.

Moreover, as relevant here, the communications at issue were between Mr. Rothstein and the CPSC, an entity that was not his client, and in fact an entity that both Mr. Rothstein and Spin Master considered to be an adversary in an important matter (Spin Master's compliance with federal law). (Spin Master Br. at 2) Under the circumstances, no communications Mr. Rothstein had with the CPSC ever could have been privileged from moment one. See Ungar Decl. Ex. H (MDL Order) at 7-8, 9, 14; In re Initial Pub. Offering Sec. Litig., 249 F.R.D. at 466.

    4.    Factor 4:  Extent Of Discovery So Far Does Not Obviate The Deposition

As noted, Spin Master has maintained in this case from the outset that the Aqua Dots sample it provided for testing was toxic, that Bureau Veritas and EPSL should have figured that out, and that Spin Master relied on Bureau Veritas/EPSL's test results in deciding to sell the product to the public. Mr. Rothstein's letters to the CPSC constitute the first direct evidence Defendants have obtained demonstrating that not even Spin Master believes the story it is trying to sell in this case.[7] Likewise, there has been no other testimony from Spin Master in this case that makes the point as clearly. As to deposing some Spin Master employee about Mr. Rothstein's letters (Spin Master's basis for arguing that Mr. Rothstein's deposition is

---

[7]    Note that Spin Master produced these letters only recently, and only after it was ordered to do so by the MDL court, so getting even these documents from Spin Master has been arduous.

17

unnecessary, Spin Master Br. at 9, 11), quite obviously, that person will have the ability to disavow anything in Mr. Rothstein's letters by stating that such witness was not the author and he/she does not know how or why Mr. Rothstein made the factual assertions he made.  In short, there is no substitute for deposing the actual author of a letter containing damning admissions, and no other discovery taken to date or to be taken can make that deposition superfluous.

Beyond that, Spin Master's suggestion that Defendants can get the same information from a 30(b)(6) deposition is disingenuous in the extreme.  EPSL previously served a 30(b)(6) notice seeking a deposition on "Spin Master's Communications with the U.S Consumer Product Safety Commission Concerning Aqua Dots."  (Ungar Decl. Ex. I (EPSL 30(b)(6) notice) Topic 20)  Spin Master objected in toto, refusing to provide a witness on that subject.  (Ungar Decl. Ex. J (Spin Master 30(b)(6) objection) Topic 20)  Spin Master cannot avoid Mr. Rothstein's deposition by seriously suggesting the alternative of a 30(b)(6) notice with which Spin Master already has refused to comply.  Regardless, and quite obviously, Defendants are not limited to a 30(b)(6) deposition in lieu of deposing an identifiable person known to have discoverable information.  Cf. Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 95 Civ. 8833, 1999 U.S. Dist. LEXIS 8929, at *7-9 (S.D.N.Y. June 14, 1999) (permitting defendant to pursue fact depositions of seven former employees rather than one Rule 30(b)(6) witness).

Further, much like the in-house counsel in Tailored Lighting, who "appear[ed] to be the only witness who could testify to the myriad bases for [his client]'s interrogatory responses" (Tailored Lighting, 255 F.R.D. at 345), Mr. Rothstein ostensibly is the only witness whose testimony can shed light on the facts he relied on in making his statements to the CPSC.  Asking any other witness that question ("what was the basis for Mr. Rothstein to write X?") is likely to prompt a response of, "I don't know, ask Mr. Rothstein."  Even if a witness were willing and

actually gave an answer, its usefulness at trial would be questionable, as that testimony would be subject to a foundation or double hearsay objection, as it is difficult for one witness to testify competently about the rationale for the conduct of another.

Spin Master argues that "any questions posed to Mr. Rothstein as to what led him to make certain statements to the CPSC would concern facts based entirely on hearsay that he learned through privileged communications with his client […]."  (Spin Master Br. at 7)  As noted above, any notion of privilege with respect to these CPSC communications is long gone. See *supra* at 15.  As to hearsay, that is an evidentiary objection, not a discovery objection.  See Holman v. ICN Pharm., Inc., 98 Civ. 0674, 1999 U.S. Dist. LEXIS 20017, at *4 (S.D.N.Y. Dec. 29, 1999) ("the fact that Panic may have no personal knowledge of the decision to withdraw Trisoralen and knows only what he was told by others does not affect the appropriateness of taking his deposition.  Even hearsay is fair ground in discovery.") (citing Litton Systems, Inc. v. Am. Tel. & Tel. Co., 700 F.2d 785, 827 (2d Cir. 1983) (internal citation omitted)).

Finally, Spin Master's argument that its written "communications [with the CPSC] speak for themselves" is a non-answer.  (Spin Master Br. at 6)  If this were true, then no deposition of any witness in a commercial case ever would be permitted, as every document ostensibly "speaks for itself."  Being the author of key documents is a primary reason for getting deposed, not an excuse to avoid that obligation.  Regardless, as noted at the outset, the Court can rest assured that Spin Master and Mr. Rothstein will come up with some argument as to why these documents should not be taken at their face value, and Defendants are entitled to learn such arguments through the discovery process.

B.      Spin Master's Accusation Of Impropriety Is Wholly Unsubstantiated

Spin Master baldly asserts that EPSL's subpoena constitutes an "improper and harassing discovery tactic." (Spin Master Br. at 11) Considering that Spin Master refused to produce its facially relevant communications with the CPSC and had to be ordered by a court to do so, its accusation of improper discovery tactics is ironic. Regardless, Spin Master's accusations are baseless. Spin Master has produced correspondence that is very damaging to its case. EPSL seeks no more than to depose the author of that correspondence. To be sure, if the communications at issue had been authored by a Spin Master employee or anyone else on the planet other than Mr. Rothstein, EPSL still would be seeking to take the deposition of the author, and likely Spin Master would have no objection about it. That Spin Master put Mr. Rothstein in the circumstance of being a relevant fact witness is not a circumstance of EPSL's making, and it certainly does not present a basis for accusing EPSL of impropriety.

C.      Seventh Circuit Law Does Not Preclude The Deposition

Although not relevant because Second Circuit law controls this motion (Texaco Inc. v. Pennzoil Co., 784 F.2d 1133, 1156 (2d Cir. 1986) ("a forum has compelling reasons for applying its own procedural rules and enormous burdens are avoided when a court applies its own rules, rather than the rules of another state, to issues relating to judicial administration") (internal citations and quotation marks omitted); In re Ski Train Fire, 343 F. Supp. 2d 208, 217 n.8 (S.D.N.Y. 2004) ("A transferee federal court should apply its interpretations of federal law, not the constructions of the transferor circuit. No litigant has a right to have the interpretation of one federal court rather than that of another determine [her] case. This principle applies to federal procedural law as well as substantive law. Because discovery is unquestionably an issue of federal procedural law, the resolution of discovery issues is governed by the law of the Second

20

Circuit.") (internal citations and quotation marks omitted, brackets in original); Astra Aktiebolag v. Andrx Pharms., Inc., 208 F.R.D. 92, 102 (S.D.N.Y. 2002) ("[L]aw regarding document disclosure is procedural.  Courts use choice-of-law rules to determine whether to apply another forum's substantive law but always use their own procedural rules.") (internal citation omitted)), Spin Master and Mr. Rothstein cite Seventh Circuit law in their motion to quash because that motion initially was brought in the Northern District of Illinois.  Likewise, because the motion for protective order and the motion to quash are substantially identical, this opposition focuses on the allegations and cases set forth in the motion for protective order.  Nevertheless, and solely to avoid any argument that silence connotes consent, EPSL briefly addresses the non-overlapping cases relied on in the motion to quash.

The motion to quash mistakenly assumes that the Eighth Circuit's decision in Shelton v. American Motors Corp., 805 F.2d 1323 (8th Cir. 1986) provides the governing framework for determining whether an attorney deposition is appropriate.[8]  First, as mentioned *supra* at 8-9, the Second Circuit has rejected Shelton, finding that "the deposition-discovery regime of the Federal Rules of Civil Procedure requires a more flexible approach than the rigid *Shelton* rule."  In re Friedman, 350 F.3d at 67.  Indeed, this Court recently addressed the issue of when counsel can be deposed and it relied entirely on Friedman, without even a mention of Shelton, further demonstrating that Shelton is *not* the law in this circuit.  See Tailored Lighting, 255 F.R.D. at 344.  Accordingly, Shelton cannot be relied upon here.  Second, Shelton, an Eighth Circuit case, would not even be controlling in the Seventh Circuit, as that court has not addressed whether the

---

[8]    Shelton requires the party seeking the deposition to demonstrate that: "(1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case."  Shelton, 805 F.2d at 1327 (internal citation omitted).  For the reasons noted above (*supra* at 8-19), EPSL could satisfy this standard too, even though it is not applicable.

factors announced in Shelton apply to the relevant analysis.  See, e.g., Wilson v. O'Brien, 07 C

3994, 2010 U.S. Dist. LEXIS 33721, at *7 (N.D. Ill. Apr. 6, 2010) ("Since *Shelton* was decided,

several courts have applied the factors set out in that case.  However, neither the Seventh Circuit

nor the Supreme Court is among their numbers […].  In fact, other courts have disapproved of

the Eighth Circuit's approach on the ground that it is overly strict.") (internal citations omitted).

      Indeed, courts within the Seventh Circuit are split as to whether Shelton applies.  A

number of cases in the Northern District of Illinois (where Spin Master and Mr. Rothstein

initially moved to quash) expressly have rejected Shelton.  See Wilson v. O'Brien, 07 C 3994,

2010 U.S. Dist. LEXIS 33721, at *7 (N.D. Ill. Apr. 6, 2010) (rejecting overly strict Shelton

factors in favor of more flexible approach); Qad.inc v. ALN Associates, Inc., 132 F.R.D. 492,

494-95 (N.D. Ill. 1990) (Shelton "must be viewed as wrong" and requiring prior resort to other

discovery devices would be "less efficient, more expensive, [and] more time consuming"); Srail

v. Vill. of Lisle, 07 C 2617, 2007 U.S. Dist. LEXIS 92363, at *6 (N.D. Ill. Dec. 12, 2007)

("Shelton analysis does not apply when the topics of deposition involve counsel's knowledge of

a prior underlying matter that is relevant to the current litigation").  As for those cases that do not

reject Shelton outright, each of them includes a determination that the party seeking the

deposition failed to demonstrate that no other means existed for obtaining the relevant

information.  Because Mr. Rothstein, as the author of the CPSC communications at issue, is the

only source from whom the relevant information can be obtained in a direct and efficient

manner, EPSL should not have to embark upon a wild goose chase of "roundabout" discovery

devices to uncover the factual information that Mr. Rothstein clearly possesses.  Qad.inc., 132

F.R.D. at 494.

22

<u>CONCLUSION</u>

For the foregoing reasons, this Court should deny the motion for protective order, deny the motion to quash, and order Mr. Rothstein to appear for deposition.

Dated: New York, New York
      February 18, 2011

                KASOWITZ, BENSON, TORRES
                  & FRIEDMAN LLP

                By: s/ Dorit Ungar
                    Daniel P. Goldberg
                    Dorit Ungar
                    Avi Israeli
                1633 Broadway
                New York, New York 10019
                (212) 506-1700
                *Attorneys for Defendant*
                *Eurofins Product Safety Labs, Inc.*

## CERTIFICATE OF SERVICE

I, Dorit Ungar, hereby certify that on February 18, 2011, I caused (a) Eurofins Product

Safety Labs, Inc.'s Memorandum of Law in Opposition to Plaintiff Spin Master Ltd.'s Motion

For Protective Order and Spin Master Ltd.'s and Ronald Y. Rothstein's Motion to Quash Non-

Party Subpoena; and (b) the Declaration of Dorit Ungar, including Exhibits A through J, to be

served on the following counsel of record by Electronic Case Filing:

| | |
|---|---|
| Ronald Y. Rothstein, Esq. | Theodore V. H. Mayer, Esq. |
| Bryna J. Dahlin, Esq. | Eric Blumenfeld, Esq. |
| WINSTON & STRAWN LLP | HUGHES HUBBARD & REED LLP |
| 35 West Wacker Drive | One Battery Park Plaza |
| Chicago, Illinois 60601 | New York, New York 10004 |

*Of Counsel:*              *Of Counsel:*
Dennis R. McCoy, Esq.          Keith N. Bond, Esq.
HISCOCK & BARCLAY, LLP         WALSH, ROBERTS & GRACE
1100 M&T Center                400 Rand Building
3 Fountain Plaza               Buffalo, New York 14203-1928
Buffalo, New York 14203

*Attorneys for Plaintiff Spin Master Ltd.*   *Attorneys for Defendant*
                                             *Bureau Veritas Consumer Products Services, Inc.*

Dated:  February 18, 2011

                                             s/ Dorit Ungar
                                             Dorit Ungar