**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**SPIN MASTER LTD.,**

                                        **Plaintiff,**                          **08-CV-923A (Sr)**

**v.**


**BUREAU VERITAS CONSUMER PRODUCTS**
**SERVICE, INC., et al.,**

                              **Defendants.**

---

## DECISION AND ORDER

This case was referred to the undersigned by the Hon. Richard J. Arcara, pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.  Dkt. #9.  The case was subsequently transferred to the Hon. Elizabeth A. Wolford.  Dkt. #169.


Spin Master, Ltd. ("Spin Master"), commenced distribution of Aqua Dots, an arts and crafts toy for children, for retail sale in April of 2007.  In June of 2007, Spin Master retained defendant Bureau Veritas Consumer Products Services, Inc. ("Bureau Veritas"), to conduct live animal toxicity testing on Aqua Dots.  Bureau Veritas engaged defendant Eurofins Product Safety Labs ("Eurofins"), to perform acute oral toxicity ("AOT"), tests pursuant to 16 C.F.R. § 1500.3(c)(2)(i)(A), which defines acute toxicity as any substance producing death within 14 days in half or more than half of a sufficient group of white rats when a single dose from 50 milligrams to 5 grams per kilogram of body weight is administered orally.

Eurofins noted difficulty in getting the rats to ingest the beads and reported on August 10, 2007 that

> 38 spheres of each color of the pellets from the above product provided by the Sponsor were placed into an appropriate container and covered with 10 ml of corn oil by [Eurofins].  The prepared sample was then placed into an incubator for 72 hours at 37-39°C.   The resulting extract solution was considered to be the test substance.

> * * *

> The test substance was administered orally at a dose level of 5,000 mg/kg to three female rats following the Up-Down procedures described in PSL's test method P203, ACTS and Federal Hazardous Substances Act, 16 CFR, Section 1500.3, 1999.  All animals survived, gained body weight and appeared active and healthy during the study.  There were no signs of gross toxicity, adverse pharmacological effects or abnormal behavior.  Based on these results, the test substance is not considered to be toxic according to 16 CFR, Section 1500.3(c)(2)(i)A), 1999.

On November 7, 2007, Aqua Dots were recalled after children ingested them and became comatose due to the presence of 1,4-butanediol, a chemical which metabolized into gamma-hydroxy butyrate ("GHB"), a/k/a the date rape drug.  Spin Master alleges that the AOT test was flawed and that the dosing of animals did not conform with 16 C.F.R. § 1500.3(c)(2)(i)(A).  Spin Master claims that Bureau Veritas and Eurofins were grossly negligent in testing and reporting the safety of Aqua Dots and that Eurofins was negligent in its performance of the animal testing of Aqua Dots. Dkt. #7.

Currently before the Court are a ridiculous number of discovery disputes, perfectly capturing the rationale for recent reforms to the Federal Rules of Civil

Procedure to address concerns that civil litigation has become too expensive, time-consuming and contentious, thereby inhibiting effective access to the courts by parties seeking a just resolution to their dispute.  To allay these concerns, the updated Rules emphasize proportionality, a concept sorely missing in the discovery demanded in this case.  Although this dispute was presented to the Court before the updated Rules went into effect, the amendments are applicable to all cases currently pending before the Court.  As a result, the Court approaches this dispute cognizant that the scope of discovery should be determined not only in comparison to the value of the pending claim, but also with consideration as to the potential relevance of the information sought.

**Defendants' Demands**

**Continued Deposition of Anton Rabie**

Eurofins seeks an additional three hours to depose Spin Master's CEO, Anton Rabie. In support of their request, Eurofins argues that although they accommodated Mr. Rabie by traveling to Toronto for the deposition, Mr. Rabie refused to schedule his deposition earlier than 10:00 am (he was playing tennis prior to the deposition), and 45 minutes of the seven hours allotted for his deposition remained outstanding when Eurofins' counsel left for the airport to catch their flight home. Eurofins argues that the deposition was delayed by Mr. Rabie's long-winded and tangential responses and Spin Master's counsel's repeated and argumentative speaking objections. Eurofins requests additional time because Mr. Rabie is a key witness in a complex case with a significant amount at stake.  Although Eurofins also

notes that its co-defendant, Bureau Veritas, was unable to question Mr. Rabie, Bureau Veritas does not ask to depose Mr. Rabie.

Spin Master responds that counsel had sufficient time to complete the deposition and arrive at the airport in time for their flight home and notes that Eurofins has failed to articulate any basis to further question Mr. Rabie.

Upon consideration of the parties' arguments and review of the video of Mr. Rabie's deposition, the Court finds it unlikely that additional questioning of Mr. Rabie would yield competent evidence that could not be gleaned through more direct sources. As a result, the Court declines to order Mr. Rabie to complete his deposition.

**Mr. Rabie's Deposition Notes**

Eurofins argues that it is entitled to review all notes Mr. Rabie brought with him to the deposition and took during the course of his deposition. Eurofins states that Mr. Rabie referred to his notes during the course of his deposition.

Spin Master responds that it will produce the notes taken during the course of his deposition "when and if they are located," but that Mr. Rabie's notes from his deposition preparation session with counsel contain details of confidential communications with counsel made for the purpose of providing legal advice regarding pending litigation, rendering them protected from disclosure by the attorney-client privilege.

The court is perplexed by Spin Master's suggestion that notes taken by Mr. Rabie during his deposition would need to be located, as the deposition transcript is clear that counsel for Eurofins instructed counsel for Spin Master to preserve all of Mr. Rabie's notes pending resolution of this dispute by the Court.  In addition, immediately following the deposition, counsel for Eurofins sent an e-mail to counsel for Spin Master reiterating their demand for the notes Mr. Rabie took during his deposition and their expectation that they would be preserved.  These notes shall be produced to Eurofins without further delay.

As to the notes Mr. Rabie brought into the deposition with him, the Court finds insufficient evidence that Mr. Rabie relied upon the contents of these notes during the course of his deposition.  As a result, the Court does not believe that the interests of justice necessitates discovery of notes taken by Mr. Rabie while preparing for his deposition with his attorney.  *See Robinson v. Time Warner, Inc.*, 187 F.R.D. 144, 147 (S.D.N.Y. 1999) (disclosure not required where deposition transcript does not reveal actual reliance upon documents reviewed in anticipation of deposition).

**Deposition of Ronnen Harary**

Eurofins served a notice of deposition upon Ronnen Harary, Spin Master's Co-CEO, on March 18, 2011.

By e-mail dated June 10, 2011, Spin Master informed Eurofins that they would not produce Mr. Harary because he had no involvement in the Bureau Veritas testing issues and any testimony he could provide would be duplicative of other

witnesses who had been deposed.  Spin Master notes that the deposition of Mr. Harary in the multi-district personal injury litigation revealed that Mr. Harary had no specific knowledge of the underlying facts regarding the sale of Aqua Dots and argues that his testimony would be cumulative of other witnesses.

Eurofins argues that Mr. Harary was a top decision maker at Spin Master and was the highest-level executive responsible for quality control regarding Aqua Dots. Given their defense that Spin Master's quality control protocols were insufficient, Eurofins argues that Mr. Harary's deposition is required.

The Court agrees that as a co-CEO with primary responsibility for quality control of products, including Aqua Dots, Mr. Harary's deposition is appropriate.

**Deposition of Mark Segal**

Eurofins served its notice of deposition upon Mr. Segal on June 22, 2011. Despite the fact that Mr. Rabie testified at his deposition that Mr. Segal continued to work for Spin Master as an independent contractor, Spin Master responded that Mr. Segal was no longer employed by the company and could not be compelled to appear without a subpoena, which would require Eurofins to obtain a letter rogatory from Canada.  Eurofins argues that Mr. Segal's testimony is imperative to understanding Spin Master's claimed damages.

As a review of Mr. Segal's LinkedIn profile indicates that he has returned to Spin Master as Executive Vice President and Chief Financial Officer of Spin Master,

the Court expects that Mr. Segal can be produced for deposition without further process.

**Spin Master's Calculation of Damages**

Eurofins and Bureau Veritas complain that Spin Master has refused to produce competent evidence of the damages it seeks in this action.  More specifically, they complain that Spin Master has failed to produce documents supporting their claims, such as invoices, bills and receipts, instead producing post-litigation summaries which do not reconcile with the amounts set forth in their initial disclosures,[1] preventing defendants from verifying the accuracy of Spin Master's claims.

Spin Master responds that it has produced all documents responsive to defendants' discovery requests for damages, including more than 250,000 pages of documents, and has identified a Rule 30(b)(6) witness for deposition regarding its disclosure.

Spin Master's SAP Database

Eurofins states that the deposition of Spin Master's Rule 30(b)(6) witness, Craig Schkolne, revealed that Spin Master's SAP operating system records every transaction relating to Spin Master's products and can produce all of the requested

---

[1] Spin Master's Supplemental Rule 26(a)(1) disclosure seeks compensatory damages "in excess of $123 million, which represents the (1) costs incurred as a result of the November 7, 2007 Aqua Dots recall; (2) lost profits; (3) litigation exposure and settlement costs and (4) damage to reputation suffered as a result of Bureau Veritas and Eurofins' gross negligence, negligence, and deceptive and unfair practices in connection with the Aqua Dots testing."

documents for the Aqua Dots and Pixos production lines in an exportable format, thereby substantiating Spin Master's recall costs and lost profits.

Spin Master responds that it has "produced exports from SAP, including most of the data referenced in [Eurofins'] letter" of November 4, 2010.  Spin Master objects to any requests to produce archived paper documents underlying database entries as overly burdensome, excessively expensive and not reasonably calculated to lead to the discovery of relevant, admissible evidence.

By letter dated September 16, 2011, Bureau Veritas complains that "Spin Master has not produced its SAP database in its entirety, nor has it produced a compilation of all database fields populated for the Aqua Dots and Pixos product lines." Bureau Veritas seeks "all of the raw financial data that Spin Master is holding related to Aqua Dots and Pixos."

By letter dated September 16, 2011, Spin Master states that it "has turned over its entire SAP database as it relates to Aqua Dots" and argues that the problem is defendants' inability to navigate the contents of the database.

To the extent that information contained on paper documents was entered into the SAP database in the ordinary course of business, the production of the database is sufficient to satisfy plaintiff's obligation under Rule 34 to provide documentation supporting its calculation of damages.  Requiring Spin Master to produce the underlying documents would be unduly burdensome.  However, to the

extent that it has not already done so, Spin Master shall extract and produce information contained in any field in its SAP database which pertains to both the Aqua Dots and Pixos product lines for the entire time frame relevant to Spin Master's claim for damages.

### 2009 Annual Audited Financial Statements

Eurofins seeks Spin Master's 2009 audited financial statements, which Spin Master claims are irrelevant.  However, Eurofins argues that in its Rule 26 disclosures, "Spin Master keys its lost profits for Aqua Dots off the Pixos sales for the period of November 2008 - June 2009, thus plainly making its 2009 financial performance on Pixos and overall [sic] relevant to its damages theory."

If Spin Master seeks lost profits for 2009, it shall disclose its 2009 audited financial statements.

### 2008 and 2009 General Ledger

As it is no longer seeking reputational damages, Spin Master argues that its income statements, cash flow statements and balance sheets are no longer relevant. As a private company, Spin Master argues that it's finances are highly sensitive, proprietary and closely protected.  As it only seeks to recover recall costs with respect to Aqua Dots and lost profits with respect to the Aqua Dots/Pixo's product, Spin Master argues that demands for its overall income statements, cash flow statements and balance sheets are over broad, as they would disclose highly sensitive information regarding product lines which are not relevant to this litigation.

Eurofins responds that "there are only two ways for Defendants to verify the sales numbers for Pixos . . . reflected in the various spreadsheets thus far produced; first, by way of source documents referenced in such spreadsheets, such as the invoice for every sales transaction, which concededly would be burdensome for Spin Master to collect; or second, by way of a comparison of the general ledger for all product lines to the aggregate sales number in the annual audited financials."

By letter dated September 16, 2011, Spin Master replies that its general ledger "comprises a massive compilation containing literally millions of data entries concerning the financial transactions of the entire company."  Spin Master argues that "[a] request of this scope and magnitude, which would entail reviewing millions of pages of documents and involve hundreds of attorney hours, is blatantly unjustified when the stated purpose is merely to verify the information Eurofins already has."  In addition, Spin Master argues that it would be impossible to manipulate the data in its general ledger for verification purposes.

The Court agrees that this request is overly broad and unduly burdensome.  Accordingly, Eurofins request for production of Spin Master's General Ledger is denied.

Spin Master's 2007-2009 Contemporaneous Budgets & Forecasts

Eurofins argues that all projections produced by Spin Master thus far appear to have been created after the fact and relate solely to Pixos.  Eurofins seeks all

contemporaneous Aqua Dots and Pixos budget and forecast information for 2007 -
2009 in the form it exists on its server.

By letter dated October 25, 2010, Spin Master states that it has "produced
documents detailing the totals, by product, for Aqua Dots and Pixos gross sales from
2007, 2008, 2009 and 2010, and any costs, budgets, and forecasts related thereto."
Moreover, in response to Eurofins' demand for "source documents" substantiating
these figures, Spin Master states that on October 20-21, 2010, it produced such source
documents.

By letter dated September 16, 2011, Spin Master reiterates that is has
produced all budgets and forecasts in its possession and reiterates that it has
"conducted exhaustive searches for any other 'contemporaneous' budgets and
forecasts," but has discovered no additional documents.

The Court accepts plaintiff's representation that no further documents
exist.  However, given the repeated demands that Spin Master search for such
documents, and Spin Master's representations that it has done so, Spin Master will not
be permitted to supplement its document production with additional documentary
evidence of its budget or forecasts for Aqua Dots and Pixos.

Retail and Warehouse Inventory Data for 2007

Although Spin Master claims that it possesses no retailer data, Eurofins
notes that the testimony of Spin Master's corporate controller, Craig Schkolne, indicates

that documents containing such information exist.  In addition, Eurofins notes that Spin

Master has produced some documentation showing the inventory of Aqua Dots that

various retailers had on hand.

By letter dated September 16, 2011, Spin Master responds that it

possesses only some retail inventory data, primarily in the form of retailer point of sale

reports, which were made available to Spin Master by select retailers via web access.

Spin Master states that it did not procure or retain all of these reports, but has produced

those documents which were in its possession.  Spin Master suggests that defendants

may obtain more comprehensive retail figures through subpoenas to third-party retailers

who made the information available to Spin Master in the first place. Spin Master states

that it is collecting and will produce its warehouse inventory data.

To the extent that the retail figures are contained within Spin Master's

SAP, the Court trusts that, in accordance with the Court's determination regarding

disclosure of the SAP database, it has already been or will soon be disclosed to

defendants. To the extent that this information is not contained within Spin Master's

SAP and is not otherwise in Spin Master's possession, the absence of such information

suggests a problem of proof for Spin Master's damages claim as it pertains to the recall

of retail inventory.  However, to the extent that defendants are seeking this

documentation to verify Spin Master's retail inventory calculations, the Court agrees

that such information is most appropriately obtained by defendants from the third-party

retailers directly.

### Aqua Dots Return Figures

Eurofins seeks "documents reflecting Aqua Dots returns figures for the US, and back-up for the recall numbers disclosed in Spin Master's 2007 and 2008 audited financials and any recall numbers disclosed in Spin Master's 2009 audited financials," claiming they are "absolutely necessary" for Eurofins and its damages expert to make sense of Spin Master's damages claim.  Eurofins argues that the two spreadsheets Spin Master belatedly produced do not contain return figures for Aqua Dots in the United States and that another document produced by Spin Master containing return figures appears to have been prepared specifically for this litigation rather than kept in the ordinary course of business.

By letter dated September 16, 2011, Spin Master states that it has produced any information that exists reflecting Aqua Dots returns for the United States.

The Court accepts plaintiff's representation that no further documents exist.  However, given the repeated demands that Spin Master search for such documents, and Spin Master's representations that it has done so, Spin Master will not be permitted to supplement its document production with additional documentary evidence of Aqua Dots returns.

### Reputational Damages

Defendants seek a stipulation of dismissal with prejudice of Spin Master's $40 million claim for reputational damages.

Spin Master concedes that it is no longer claiming damages to its reputation.

In reliance upon this representation, Spin Master is precluded from claiming or introducing evidence regarding any damage to its reputation among customers and/or retailers resulting from the recall of Aqua Dots.

**Shipments of Aqua Dots**

By letter dated September 16, 2011, Eurofins seeks documentation reflecting shipments of Aqua Dots to retailers and consumers in order to demonstrate that the bulk of Aqua Dots were shipped prior to Spin Master's receipt of Eurofins' test report and that Spin Master continued to ship Aqua Dots after discovering the chemical substitution and being advised of reports of injuries, thereby refuting Spin Master's reliance upon that report in determining the safety of Aqua Dots.  Eurofins argues that such information should be contained within Spin Master's SAP database.

By letter dated September 16, 2011, Spin Master states that it has produced all requested documents evidencing shipments of Aqua Dots.

Despite Spin Master's representation, this issue remains on the April 20, 2012 list of pending discovery issues.

Although the Court believes that this request should be resolved by virtue of Spin Master's production of the SAP database, it shall require Spin Master to attest

-14-

that such documentation is contained within the SAP database or that it has made a good faith search for documents responsive to this request and document the extent of such search.

**Native Files**

By letter dated September 16, 2011, Bureau Veritas' complains that in response to Interrogatory #17 seeking identification of all documents that Spin Master will rely upon to establish damages, Spin Master referred to dozens of discrete spreadsheets, including documents bates numbered SP250221 through SP250481 which it produced as images rather than in electronic form.  Bureau Veritas notes that its stipulation with Spin Master regarding electronic discovery requires the parties to produce spreadsheets and databases in their native format.

By letter dated September 16, 2011, Spin Master states that it has produced 706 native files and informed Bureau Veritas that the remaining 30 files requested were third-party documents which could only be produced in hard-copy format.  As to Bureau Veritas' request for production of SP250221 through SP250481 in native format, Spin Master states that it is in the process of producing any such documents which it possesses in native format.

To the extent that Spin Master is unable to produce the spreadsheets at issue in this dispute in native format, Spin Master shall inform Bureau Veritas who possesses the native files.

**Alex Perez's 2007 Performance Review**

By letter dated September 16, 2011, Eurofins claims that despite Mr. Perez's deposition testimony that he received a performance review in 2007, Spin Master has failed to produce it.

By letter dated September 16, 2011, Spin Master states that although a performance review occurred, it does not possess any written documentation of Mr. Perez's performance review and that the person reviewing Mr. Perez, Ian Kennedy, testified at his deposition that he did not recall documenting his evaluation of Mr. Perez in 2007.

Spin Master shall attest that it has conducted a good faith search and document its efforts to locate a written performance evaluation for Mr. Perez for 2007.

**Bureau Veritas Interrogatories #21 & 22**

Interrogatory #21 seeks the identity of any entity that has or will compensate Spin Master for any of its claimed damages resulting from the Aqua Dots recall.  Interrogatory #22 seeks documentation of any such compensation, including the date, amount, and category of damages each payment is intended to compensate.

Spin Master identified Moose Enterprises and Travelers Canada as sources of compensation for Spin Master's damages regarding the recall, but objected to discovery of any specifics regarding compensation, stating "[a]ny amounts recovered

by Spin Master in this litigation would be subject to subrogation claim(s) and as such have no bearing on Spin Master's claimed damages in this litigation."

By letter dated September 16, 2011, Bureau Veritas responds that collateral source payments are discoverable, noting that CPLR § 4545 bars double recovery on tort claims and requires the court to deduct any compensation that the plaintiff has already received.

By letter dated September 16, 2011, Spin Master states that it is in the process of producing documents responsive to Bureau Veritas' request for information regarding compensation by third-parties for damages.

The Court agrees with Bureau Veritas that information regarding compensation for damages sought in this lawsuit is discoverable and, to the extent that Spin Master has not already done so, it shall disclose the date, amount, and category of damages each payment received is intended to compensate.

**Spin Master's Claim of Privilege re: Communications with Non-lawyers**

By letter dated September 16, 2011, Bureau Veritas challenges Spin Master's claim of attorney-client privilege with respect to communications between Spin Master employees, none of whom are attorneys, and Spin Master's claim of work product with respect to communications between Spin Master employees assessing the liability of Moose Enterprises, the manufacturer of Aqua Dots.

By letter dated September 16, 2011, Spin Master requested additional time to review the communications at issue.

As this issue remains pending on the April 20, 2012 letter outlining remaining discovery disputes, the Court directs Spin Master to provide the challenged communications to the Court for *in camera* review, along with a memorandum of law setting forth its argument in support of its claim of privilege.

**Spin Master's Claim of Privilege re: Communications with Rob Yusim**

By letter dated September 16, 2011, Bureau Veritas challenges Spin Master's claim of attorney-client privilege with respect to communications between Spin Master's attorney and Rob Yusim on the ground that Mr. Yusim was not an employee of Spin Master, but an independent contractor.

By letter dated September 16, 2011, Spin Master clarifies that although Mr. Yusim is currently an independent contractor, he was an employee at the time the communications at issue were made.  In any event, Spin Master argues that Mr. Yusim's role as Manager of Spin Master's Direct Response Operations would qualify him for the protection of the privilege.

The Court finds no legal merit to Bureau Veritas' challenge of the application of attorney-client privilege to communications involving Spin Master's Manager of Direct Response Operations. *See In re: Copper Market Antitrust Litig.*, 200 F.R.D. 213, 218-19 (S.D.N.Y. 2001) (attorney-client privilege encompasses

corporation's agents, without distinction "between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice.").

**Spin Master's Claim of Privilege re: Communications between Locker & Norvell**

By letter dated September 16, 2011, Bureau Veritas challenges Spin Master's claim of attorney-client privilege with respect to three e-mail communications dated October 24 & 25, 2007 between Spin Master's attorney and Michael Norvell, a toxicologist who issued a report dated October 26, 2007 which determined that Aqua Dots beads are not toxic if ingested in reasonably foreseeable amounts, on the ground that, to the extent that the communications were in support of drafting the report rather than guiding counsel, the attorney-client privilege would not apply.

By letter dated September 16, 2011, Spin Master states that it retained Rick Locker as counsel and that Mr. Locker retained Mr. Norvell to assist him with issues relating to Aqua Dots.  Spin Master argues that the communications at issue are protected because they "contain the mental impressions and opinions of Mr. Locker and responses from Mr. Norvell."

Spin Master shall provide the e-mail communications to the Court for *in camera* review, along with a memorandum of law setting forth its argument in support of its claim of privilege.

**Plaintiff's Demands**

**Depositions of Eurofins Employees**

Spin Master seeks depositions of Carolyn Lowe, Jennifer Durando, Barbara Rose, Harry Masselli, Charles Walton, Daniel Merkel, Gary Wnorowski, Debra Letts, Palma Ann Marone and Celeste Dunn.

*Carolyn Lowe* and *Jennifer Durando*

Spin Master seeks the deposition of Carolyn Lowe, whose signature appears on the study cover sheet for the Aqua Dots test, and Jennifer Durando, who signed the Aqua Dots test.

Eurofins notes that it has offered to make Ms. Lowe and Ms. Durando available for deposition on at least 18 different days, but Spin Master failed to confirm any of those dates.  At this point, Eurofins seeks to depose Spin Master's witnesses before it offers any further dates.

In light of the apparent difficulties encountered in scheduling Mr. Rabie's deposition and the depositions of Spin Master's 30(b)(6) witnesses, the Court agrees that depositions of plaintiff's witnesses should be conducted prior to the depositions of defendants' witnesses.

*Barbara Rose*

Spin Master argues that Ms. Rose has been identified as having prepared the first extraction for the Aqua Dots AOT test and seeks her testimony as to the condition of the beads after the first incubation attempt.

Eurofins argues that Ms. Rose's actions in preparing the initial extract have no relevance to Spin Master's theory that Eurofins' decision to utilize an extract to dose the animals was negligent.

The Court finds that Ms. Rose's involvement with the Aqua Dots test is sufficient to compel her deposition in this action.

*Harry Masselli*

Spin Master seeks the deposition of Mr. Masselli because "[h]is initials appear in the prep section of the Aqua Dots AOT test file" and he was listed as an individual with information regarding the Aqua Dots test in Eurofins' initial disclosures.

Eurofins argues that this issue is not ripe for resolution by the Court because Mr. Masselli was not noticed for deposition until September 19, 2011 - three days after Spin Master complained that Eurofins refused to produce him - and has not been discussed between the parties.

The Court grants Spin Master's request to compel Mr. Masselli's deposition.

*Charles Walton*

Spin Master notes that Mr. Walton's initials appear on the "Acute Toxicity Data Sheet - Oral" for the Aqua Dots AOT test.

Eurofins states that Mr. Walton dosed the first animal and conducted cage site observations during the 14 day observation period, but argues that this has no relevance to Spin Master's theory that Eurofins' decision to utilize an extract to dose the animals was negligent.

The Court finds that Mr. Walton's involvement with the animals during the course of the Aqua Dots AOT test is sufficient to compel his deposition in this action.

*Daniel Merkel*

Spin Master argues that Mr. Merkel should be produced for deposition because he trained Jennifer Durando (the Eurofins Study Director who signed the Aqua Dots test), to conduct an extract test.  Spin Master argues that Mr. Merkel has performed other AOT tests, is familiar with Eurofins' protocols and methodologies for conducting AOT tests, and may have knowledge of whether other clients have ever complained about Eurofins AOT extract testing.

Eurofins responds that Mr. Merkel had no involvement in the Aqua Dots test and should not be subjected to deposition simply because he is a study director in the AOT group and has conducted other AOT tests.

As it appears that Mr. Merkel possesses relevant information regarding AOT testing protocols at Eurofins and Ms. Durando's training to perform AOT tests utilizing extractions, the Court grants Spin Master's request to compel his deposition.

*Gary Wnorowski*

Eurofins argues that Spin Master has not noticed the deposition of Mr. Wnorowski, Eurofins' President, in a personal capacity and even if it had, because he was not directly involved in the Aqua Dots study, the only relevant information he could offer would be duplicative of his testimony as a 30(b)(6) witness on September 24, 2010.

The Court declines to compel the deposition of Mr. Wnorowski.

*Debra Letts*

Spin Master argues that Ms. Letts is listed in Eurofins' initial disclosures as a witness likely to possess discoverable information and that Jennifer Durando testified at her deposition that Ms. Letts wrote the report.

Eurofins' responds that Ms. Letts' role with respect to the Aqua Dots test report "was purely administrative and secretarial in nature" and that her work product was subject to review, editing and approval by the study director responsible for the Aqua Dots test. Gary Wnorowski testified at his 30(b)(6) deposition that Ms. Letts was a report writer, which is an administrative position responsible for taking the data and

formatting it for review by the study director, who is responsible for the contents of the report.  Jennifer Durando, Study Director for Acute Toxicity Studies and the study director for the Aqua Dots test, testified at her deposition in the Aqua Dots Product Liability Litigation that she reviewed the Aqua Dots report typed and prepared by Ms. Letts against the data before signing it.

Given the deposition testimony establishing Ms. Letts' administrative role in typing the Aqua Dots data into report format, and the role of the study director in reviewing the report, the Court declines to compel the deposition of Debra Letts.

*Palma Ann Marone*

Spin Master argues that as Eurofins' sole Director of Toxicology, Ms. Marone's supervision over Mr. Merkel and Ms. Durando may yield evidence of negligence by Eurofins.

Eurofins argues that although Ms. Marone is the Director of Toxicology, she works in the subchronic toxicology program at Eurofins, which is an entirely separate and distinct group from the AOT group which performed the Aqua Dots test.

As there is no suggestion that Ms. Marone directly supervised the Aqua Dots test or the individuals who conducted the Aqua Dots test, the Court declines to compel Palma Ann Marone's deposition.

*Celeste Dunn*

Spin Master states that it does not intend to pursue Ms. Dunn's deposition, but reserves the right to re-notice the deposition at a later date.  Eurofins reports that Ms. Dunn is Ms. Letts direct supervisor.  Absent any additional ground for the deposition of Ms. Dunn, the Court declines to compel Ms. Dunn's deposition.

**Spin Master's Request for 30(b)(6) Deposition re: Eurofins' Document Collection**

Spin Master seeks a deposition from a Eurofins employee regarding its efforts to preserve and collect documents relevant to this complaint.  In support of this request, Spin Master states that a former Eurofins employee, Michelle DeCinque, who was responsible for preparing the extract that was used to dose the animals for the Aqua Dots toxicity test, testified at her deposition that she was never told to preserve any documents for this litigation and was unaware of anyone attempting to collect documents relevant to this litigation.

Eurofins responds that Ms. DeCinque signed a memorandum confirming that she had turned over all materials in her possession regarding the litigation with Spin Master.

Upon review of the memorandum signed by Ms. DeCinque confirming that she had turned over all documents and materials even potentially relevant to the Spin Master litigation, the Court finds no basis to subject Eurofins to a 30(b)(6) deposition regarding Eurofins' document collection with respect to this matter.

**Spin Master's Interrogatory #3 to Eurofins**

Spin Master's Interrogatory #3 to Eurofins seeks the employee file, date of hire, job title when hired, job title when Aqua Dots test was performed, resume submitted at time of application, credentials, certifications, accreditations, educational background and prior work experience required of the job description for the job for which they were hired, and why the following individuals were hired for their position over other candidates for every individual who performed any step in the Aqua Dots AOT test.

Eurofins objects to the interrogatory as vague, ambiguous, overbroad, seeking personal and private information of a sensitive nature, seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence and seeking information more appropriately requested by other, less burdensome, means.  Subject to those objections, Eurofins identified twelve individuals involved in the Aqua Dots AOT test and produced the employee files for four employees, *to wit*, Jennifer Durando, Carolyn Lowe, George Moore and Michelle DeCinque.

Spin Master complains that Eurofins has refused to provide information other than the names of Debbie Letts, Charles Walton, Maryann Zakrzewski, Harry Masselli, Cindy Bodnar, Jacek Ochalski, Anselmo Villagran and Barbara Rose.

In light of interrogatory responses indicating that Charles Walton, Maryann Zakrzewski, Harry Masselli, Cindy Bodnar, Jacek Ochalski, Anselmo Villagran and

Barbara Rose were all involved in the dosing, weighing and observation of the animals used in the Aqua Dots AOT test, the Court directs disclosure of the following information with respect to these individuals: date of hire, job title for which they were hired, job title at the time of the Aqua Dots AOT test and job description for their job title at the time of the Aqua Dots test.  Although not properly requested as an Interrogatory, the Court will also direct Eurofins to produce, to the extent that such information is contained within its personnel files, resumes, performance evaluations for 2006, 2007 and 2008, and disciplinary action taken against any of these individuals in 2006, 2007 and 2008.  As it appears that she was simply the typist of the Aqua Dots test report, Eurofins need not provide such information for Debra Letts.

**Michelle DeCinque**

Spin Master seeks production of Michelle DeCinque's employee file, as well as all documents and electronically stored information pertaining to her termination for failing to follow proper procedures during an AOT study.  Spin Master also seeks any documents "used or generated by Michelle DeCinque in creating an extraction of test material for the purposes of conducting toxicity studies" at Eurofins.

Eurofins responds that it had produced Ms. DeCinque's personnel file prior to her termination and produced Ms. DeCinque's termination record on August 24, 2011, but objects to Spin Master's demand for electronically stored information on the ground that such information was not contained with Eurofins' personnel files and has not otherwise been requested in written discovery demands.  Eurofins also argues that

Spin Master has failed to serve a discovery demand seeking documents pertaining to Ms. DeCinque's purported deviation from proper dosing procedures. Eurofins states that it has produced all of the documents referenced by Ms. DeCinque during her deposition.  Eurofins objects to production of documents generated by Ms. DeCinque in preparing extract solutions in other studies as irrelevant and burdensome.

Eurofins is directed to produce any electronically stored information pertaining to Ms. DeCinque's termination and any documentation, including electronically stored information, pertaining to Ms. DeCinque's purported deviation from proper dosing procedures during AOT tests.

**Spin Master's Interrogatory ##9 & 10 to Eurofins**

Spin Master's Interrogatory #9 asks Eurofins to identify and describe each test involving live animals that Bureau Veritas requested Eurofins to perform during their business relationship, including but not limited to each Acute Oral Toxicity Test. Spin Master's Interrogatory #10 asks Eurofins to identify and describe every AOT test performed by Eurofins, including but not limited to any such tests performed by Jennifer Durando or Carolyn Lowe, from 2006 to the present.

Eurofins objects that the interrogatories are overly broad, unduly burdensome and seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Spin Master subsequently limited the request to tests using an extraction method and, alternatively, seeks production relating to live animal tests using extractions.

Spin Master argues that discovery of all of Eurofins' AOT testing is relevant to evaluate Eurofins' experience in conducting the testing at issue, its qualifications to claim expertise in such testing, and its claim that others have accepted tests that have used Eurofins' methodology. Spin Master notes that "Eurofins itself relies on these other AOT tests as its sole basis for believing that its testing methodologies are accepted within its industry." Spin Master questions whether, in other tests, Eurofins actually dosed the test substance, as it should have dosed the Aqua Dots beads given to the test animals (which would tend to show Eurofins' negligence in this test), or whether Eurofins conducted some other testing using some form of extract method which measured the correct amount of test substance present in the corn oil or other delivery liquid.

Eurofins notes that a live animal test using extractions may not entail AOT testing and AOT testing may not entail use of extractions. In any event, Eurofins responds that documents concerning tests other than the one at issue in this case are irrelevant. Eurofins argues that whether Eurofins performed testing on unrelated products for unrelated entities in a negligent or diligent manner has no bearing on whether Eurofins acted negligently with respect to this test. In addition, Eurofins argues that the production of the requested information would lead to a series of mini-trials as to whether unrelated tests were conducted properly. Also, Eurofins notes that there is

no way for it to cull the information requested except to rely upon employee recollections, as its database does not track whether tests utilized an extraction.

The Court agrees with Eurofins that these interrogatories are overbroad and that the production of information relating to every live animal test Bureau Veritas asked Eurofins to perform or every AOT test performed by Eurofins, even if limited to every AOT test performed by Eurofins utilizing an extract, would be unduly burdensome and unlikely to produce information relevant to a determination of defendants' gross negligence or Eurofins' negligence in the performance of the Aqua Dots AOT test. For example, even if every AOT test using an extract was performed using exactly the same protocol as the AOT extract test of Aqua Dots, that does not establish that the protocol itself was appropriate.  Accordingly, Spin Master's motion to compel disclosure of information regarding tests other than the Aqua Dots AOT test is denied.

**Spin Master's Interrogatory #12 to Eurofins**

Spin Master's Interrogatory #12 asks Eurofins to identify and describe each instance, from 2006 to the present, in which Eurofins was unable to perform or complete a test on a consumer product, including but not limited to any instance in which Eurofins informed a client or customer that it would be unable to perform or complete a test on a consumer product, regardless of whether said test was eventually performed or completed.

Eurofins objects that the interrogatory is vague and ambiguous, overly broad, unduly burdensome and seeks information that is neither relevant nor

reasonably calculated to lead to the discovery of admissible evidence.  More specifically, Eurofins argues that its ability or inability to complete unrelated testing for unrelated clients on unrelated products has absolutely no bearing on whether Eurofins execution of the Aqua Dots test, which was completed, was negligent or grossly negligent.

The Court agrees with Eurofins that the production of information relating to uncompleted tests is unlikely to produce information relevant to a determination of defendants' gross negligence or Eurofins' negligence in the performance of the Aqua Dots AOT test.  Accordingly, this aspect of Spin Master's motion to compel is denied.

**Spin Master's Interrogatory #15 to Eurofins and #18 to Bureau Veritas -**
**Joint Defense/Common Interest Privilege**

Spin Master's Interrogatory No. 15 to Eurofins and Interrogatory No. 18 to Bureau Veritas inquires whether Eurofins and Bureau Veritas intend to withhold any of their communications with each other as privileged, and if so, asked them to explain the basis for the privilege, the nature of the relationship between Bureau Veritas and Eurofins such that any privilege should apply, why any exception to the third-party privilege would be asserted, and whether a joint defense agreement has been entered into between Bureau Veritas and Eurofins that attempts to shield communications between them as privileged, and if so, the date it was entered into.

Eurofins objects to the interrogatory "on the grounds that it calls for legal conclusions and is more appropriately addressed to counsel, and requests information

that is protected from disclosure by the attorney-client privilege, work product privilege, joint-defense doctrine and other recognized privileges against disclosure."

Bureau Veritas objects to the interrogatory, *inter alia*, "because it seeks information protected by the attorney work product rule," advising that Bureau Veritas would "not produce information that is prepared in anticipation of litigation or for trial, or that reflects counsel's mental impressions, conclusions, opinions or legal theories concerning this or any other litigation," including, "communications between [Bureau Veritas'] outside counsel and [Eurofins'] outside counsel to formulate a defense strategy on issues for which [Bureau Veritas] and [Eurofins] share a common legal interest."

Spin Master argues that it is entitled to an explanation of the facts supporting defendants' assertion of the common interest privilege and demands a privilege log of any conversations supposedly encompassed by the common interest privilege.  Spin Master also seeks a copy of any joint defense agreement between defendants.

Bureau Veritas responds that it has entered into "an oral joint defense agreement" with Eurofins "to further" Bureau Veritas and Eurofins' "common interest of defeating Spin Master's affirmative claims."  More specifically, Bureau Veritas states that defendants'

> respective counsel have communicated confidentially about
> their unified strategy to defeat Spin Master's affirmative
> claims.  Those are the only communications at issue.
> Except for the depositions on the record in this action, no

> [Bureau Veritas] employee or officer has communicated with [Eurofins'] counsel, and no [Eurofins'] employee or officer has communicated with [Bureau Veritas'] counsel.

Eurofins responds that it had

> advised Spin Master long ago that we are unaware of any communications between [Eurofins] and [Bureau Veritas] post-dating this litigation on any subject relevant to the litigation.  In terms of communication between defense counsel, the bulk of which occurred verbally, such communications are protected from discovery by the joint defense and/or common interest privilege, but in any event, communications between counsel post-dating commencement of this lawsuit simply have no bearing on Spin Master's allegations in the Amended Complaint.

The Court accepts counsels' representation that there have been communications between Eurofins' counsel and Bureau Veritas' employees or *vice versa* and agrees with defendants that any such discussions regarding the defense of Spin Master's claims against them would be protected by the common interest rule. *See U.S. v. Schwimmer*, 892 F.2d 237, 243-44 (2nd Cir. 1989) (common interest rule protects confidentiality of communications passing from one party to the attorney for another party whenever multiple clients share a common interest about a legal matter). The Court will not direct disclosure of communications between counsel for co-defendants.

**Spin Master's Interrogatory #17 to Eurofins**

Spin Master's Interrogatory #17 asks Eurofins to identify the Bates number and date of distribution or dissemination of each document produced in

-33-

response to Spin Master's Request for Production #15, which seeks Eurofins' 2006-2007 promotional and marketing materials.

Eurofins objects that the interrogatory is vague and ambiguous, overly broad, unduly burdensome and sseeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Spin Master argues that Eurofins' objections are insufficient.

Eurofins responds that many of the marketing and promotional documents were never distributed or disseminated in a conventional sense.

The Court agrees with Eurofins that this interrogatory is vague and ambiguous.  Moreover, given that the documents produced were limited to the time frame of 2006-2007, the Court finds it hard to imagine the relevance of an exact date of distribution for any such materials.  As a result, this aspect of Spin Master's motion to compel is denied.

**Spin Master's Interrogatory #8 to Bureau Veritas**

Spin Master's Interrogatory #8 asks Bureau Veritas to identify each employee at Bureau Veritas who performed services related to Aqua Dots and for each employee identified, explain what services they performed and their relevant credentials, certifications, accreditations, educational background and prior work experience that qualified them to perform those services.

Bureau Veritas objects that the interrogatory imposes an undue burden to determine every work experience, credential and educational qualification relevant to the testing at issue and that the interrogatory seeks information relating to employees who performed services unrelated to the testing at issue.  Notwithstanding its objections, Bureau Veritas identified seven employees and provided some information relating to each employee identified.

Spin Master complains that Bureau Veritas has failed to provide sufficient information with respect to Michelle Korkowicz and Glori Flores.  Michelle Korkowicz is an Account Specialist who referred the Aqua Dots AOT test to Eurofins and monitored its status and Glori Flores is a Senior Technical Processor who assembled the technical report dated August 10, 2007 regarding the Aqua Dots AOT test and the February 13, 2008 technical opinion on reworking recalled units of Aqua Dots.

Bureau Veritas shall disclose to Spin Master a resume or, if a resume is not available, any information contained within its personnel files documenting the credentials, certifications, accreditations, educational background and prior work experience of Michelle Korkowicz and Glori Flores.

**Spin Master's Interrogatory #10 to Bureau Veritas**

Spin Master's Interrogatory #10 asks Bureau Veritas to identify each policy, procedure, description, handbook or manual describing how, at the time the Bureau Veritas/Eurofins AOT testing was performed, Bureau Veritas ensured that each

and every Oral Toxicity test requested met the level of skill, expertise and quality necessary to ensure the test was performed correctly and the test rendered accurate and reliable results.

Subject to objections, Bureau Veritas responded that it "chose a laboratory which, among other qualifications, (a) had the experience and expertise to perform acute oral toxicity testing pursuant to 16 C.F.R. § 1500.3(c)(2)(i)(A); (b) had an excellent reputation in the testing industry for performing animal tests competently; and (c) had a proven track record of competently performing acute oral toxicity tests for [Bureau Veritas] dozens of times, without incident, over a period of at least eight years leading up to the Subject Testing."

Spin Master argues that Bureau Veritas' responses are perfunctory, "essentially stating that it complied with its internal procedures, but without any elaboration as [to] what particular procedures it complied with or specifically how it complied with them."

The Court finds that Bureau Veritas' response to this interrogatory is sufficient.

**Spin Master's Interrogatory #11 to Bureau Veritas**

Spin Master's interrogatory #11 asks Bureau Veritas to identify and explain all policies and procedures in place at Bureau Veritas at the time the Bureau Veritas/Eurofins Acute Oral Toxicity Testing was performed to ensure each of its

employees possessed the necessary skill to perform their respective duties relating to the testing.

Subject to objections, Bureau Veritas responds that: (a) it establishes specific criteria for each job position, which include the education and experience required for that position; (b) it hires and promotes individuals who are qualified for prospective positions; (c) it comprehensively evaluates the performance of each employee on an annual basis; and (d) it provides internal training to its employees, and it subsidized relevant external training, in order to improve employee performance.

Spin Master argues that Bureau Veritas' responses are perfunctory, "essentially stating that it complied with its internal procedures, but without any elaboration as [to] what particular procedures it complied with or specifically how it complied with them.

The Court finds that Bureau Veritas' response to this interrogatory is sufficient.

**Spin Master's Interrogatory #25 to Bureau Veritas**

Spin Master's Interrogatory #25 asks whether Bureau Veritas complied with BUF-SOP-0020 when contracting with Spin Master to perform the Bureau Veritas/Eurofins AOT test, and if so, to identify by Bates Number all documents, files and communications which support such compliance.

Subject to objections, Bureau Veritas responds that it had

complied with revision 4 of BUF-SOP-00020 (*see* BVCPS0016715-0016718), which was in effect at the time that Spin Master requested the testing at issue.  The bases for this statement are (a) the relevant sample tracking sheet indicates that BVCPS performed the contract review on June 8, 2007 (*see* BVCPS0003216); (b) the submitter, James Branco, clarified that "AT" meant "animal testing" (*see* transcript of May 26, 2011 deposition of Lori Trock at 43:14-43:23); (c) BVCPS had approved EPSL (the lab that performed the testing at issue) as a subcontractor at the time Spin Master submitted its request for the testing at issue (*see, e.g.*, transcript of Sept. 29, 2010 deposition of Elizabeth Jausler at 131:7-131:23; *see also* BVCPS0011030-0011035); (d) the terms and conditions of testing, which Spin Master approved, provided in part:

\* \* \*

(BVCPS003220); (e) Spin Master did not notify BVCPS, within 30 days of its receiving the report at issue that the testing performed pursuant to 16 C.F.R. 1500.3(c)(2)(i)(A) was not the testing that it requested (*see* Spin Master's responses to BVCPS' requests for admissions nos. 4, 5 and 6); and (f) the test request form at issue did not indicate that Spin Master might need additional testing beyond the testing that it requested.

Spin Master argues that Bureau Veritas' responses are perfunctory, "essentially stating that it complied with its internal procedures, but without any elaboration as [to] what particular procedures it complied with or specifically how it complied with them.

The Court finds that Bureau Veritas' response to this interrogatory is sufficient.

**Spin Master's Document Request #5 to Eurofins - Good Laboratory Practices ("GLP"), Live Animal Testing Protocols**

> Spin Master's Document Request No. 5 to Eurofins seeks
>
> Any and all documents and/or communications relating to your internal policies, standards, methods, protocols, guidelines and techniques related to consumer product testing pursuant to 16 C.F.R. 1500 *et. seq.*, including, but not limited to the development and implementation of said consumer product testing policies, standards, methods, protocols, guidelines and techniques.

Eurofins objects to the request on the grounds that it is "vague and ambiguous, overly broad, unduly burdensome . . . and calls for the production of documents neither relevant nor reasonably calculated to lead to the discovery of admissible evidence."  Despite these objections, Eurofins agreed "to produce non-privileged documents sufficient to identify its policies, procedures and techniques for conducting consumer product testing under 16 C.F.R. 1500 *et seq.*"

Spin Master argues that Eurofins has only produced what it represents to be the protocols applicable to the Aqua Dots test and seeks protocols that relate to other AOT testing.  Spin Master argues that it is entitled to protocols relating to other AOT testing because Bureau Veritas is relying upon Eurofins' experience, expertise, reputation and track record in the performance of AOT testing as a defense to this action and because Eurofins is relying upon its prior use of extracts and lack of prior complaints as a defense to this action.

-39-

By letter dated October 25, 2010, Eurofins responds that its Good Laboratory Practices ("GLP"), testing protocols are not relevant because the Aqua Dots test was not a GLP test.

Eurofins shall produce any internal policy, standard, method, protocol or guideline which would apply to AOT tests, including any GLP policy, standard, method, protocol or guideline which could be applied to AOT tests.

**Spin Master's Document Request #11 - Complaints re: Eurofins' Testing Services**

Spin Master's Document Request No. 11 to Eurofins seeks

Any and all documents and/or communications relating to complaints, inquiries, reports, reviews, audits, or investigations concerning your testing services, including but not limited to any government audits or investigations.

Eurofins objects to the request on the grounds that it is "vague and ambiguous, overly broad, unduly burdensome, seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and as framed seeks documents and/or communications protected from disclosure by one or more privileges." However, Eurofins agreed to "produce non-privileged documents, if any, sufficient to identify complaints, inquiries, reports, reviews, audits or investigations concerning the testing of the product at issue in this case."

By letter dated October 25, 2010, Spin Master argues that it is entitled to complaints relating to other AOT testing because Bureau Veritas is relying upon Eurofins' experience, expertise, reputation and track record in the performance of AOT

testing as a defense to this action and because Eurofins is relying upon its prior use of extracts and lack of prior complaints as a defense to this action.

By letter dated October 25, 2010, Eurofins responds that the discharge of its duty of care must be determined within the four corners of the test at issue and that complaints from unrelated clients have no bearing on whether Eurofins performed adequately with respect to the Aqua Dots test.

The Court finds that the information sought in Document Request No. 11 bears upon Eurofins' knowledge as to the reliability of its AOT protocols and testing procedures and Eurofins' ability to hold itself out as a trusted provider of AOT tests. Accordingly, Eurofins shall disclose any and all documents and/or communications relating to complaints, inquiries, reports, reviews, audits or investigation concerning its AOT testing services, including but not limited to any government audits or investigations.

**Discovery of Bureau Veritas' and Eurofins' Financial Condition**

By letter dated September 16, 2011, Spin Master complains that defendants have failed to respond to numerous discovery requests and requests for admission seeking detailed information regarding defendants' financial condition. Spin Master argues that information regarding defendants' financial condition is relevant to its claim for compensatory and punitive damages.

By letter dated September 16, 2011, Eurofins argues that Spin Master cannot sustain its claim for punitive damages and even if it could, its requests for financial information are premature and overbroad.  If any financial discovery is warranted, Eurofins requests it be limited to a sworn statement of its net worth.  By letter dated September 16, 2011, Bureau Veritas argues that its financial status is irrelevant to the claims raised in this litigation.

However tenuous defendants perceive Spin Master's claim of gross negligence to be, it remains a cause of action in this litigation.  As a result, the potential for punitive damages exists.  "Because a court may take defendants' financial circumstances, wealth, or net worth into consideration when determining the exemplary damages to be awarded against the defendants, defendants' financial information is relevant to plaintiff's claims for punitive damages."  *Renaissance Nutrition, Inc. v. Jarrett*, No. 06-CV-380, 2008 WL 1848600, at *9 (W.D.N.Y. Apr. 23, 2008).  Although the courts are split on the timing for such discovery, this Court believes that pre-trial discovery of defendants' financial information is most efficient.  *See Hazeldine v. Beverage Media, Ltd.* No. 94 Civ. 3466, 1997 WL 362229, at * (S.D.N.Y. June 27, 1997).  However, Spin Master's discovery demands with respect to defendants' financial circumstances is overbroad.  Disclosure of defendants' most recent annual audited financial statement is sufficient.

**Spin Master's Requests for Admission**

Spin Master challenges Eurofins' responses to the following requests for admission: ##4, 9, 13, 17, 18, 52, 55, 64, 65, 66, 67, 69, 70, 71, 72, 74, 75, 76, 80, 84,

87, 88, 95, 100, 101, 102, 104, 112, 113, 114, 115, 117, 118, 119 and 120 (b) and (c).

Spin Master also challenges Bureau Veritas' responses to the following requests for

admissions: ##38, 50, 52, 111(b), 137(a), 137(b) and 137(c).


Rule 36(a)(1) of the Federal Rules of Civil Procedure ("F.R.C.P."),

provides:

> A party may serve on any other party a written request to
> admit, for purposes of the pending action only, the truth of
> any matters within the scope of Rule 26(b)(1) relating to:
>
> (A)    facts, the application of law to fact, or opinions
>        about either; and
>
> (B)    the genuineness of any described documents.

F.R.C.P. 36(a)(4) explains:

> If a matter is not admitted, the answer must specifically deny
> it or state in detail why the answering party cannot truthfully
> admit or deny it.  A denial must fairly respond to the
> substance of the matter; and when good faith requires that a
> party qualify an answer or deny only a part of a matter, the
> answer must specify the part admitted and qualify or deny
> the rest.  The answering party may assert lack of knowledge
> or information as a reason for failing to admit or deny only if
> the party states that it has made reasonable inquiry and that
> the information it knows or can readily obtain is insufficient
> to enable it to admit or deny.

"Generally, a 'reasonable inquiry' is limited to review and inquiry of those persons and

documents that are within the responding party's control."  *T. Rowe Price Small-Cap

Fund, Inc. v. Oppenheimer & Co., Inc.*, 174 F.R.D. 38, 43 (S.D.N.Y. 1997).

F.R.C.P.  36(a)(5) permits a party to object to a request so long as the

grounds for such objection are stated, however, a "party must not object solely on the

ground that the request presents a genuine issue for trial."  F.R.C.P. 36(a)(5).  The

party requesting admissions

> may move to determine the sufficiency of an answer or
> objection.  Unless the court finds an objection justified, it
> must order that an answer be served. On finding that an
> answer does not comply with this rule, the court may order
> either that the matter is admitted or that an amended answer
> be served.

F.R.C.P. 36(a)(6).  "The burden is on the objecting party to persuade the court that

there is justification for the objection."  8B Charles Alan Wright, Arthur R. Miller &

Richard L. Marcus, Federal Practice and Procedure § 2263 (3d ed. 2010).  In making

such a determination, the Court is reminded that the "purpose of the rule is to reduce

the costs of litigation by eliminating the necessity of proving facts that are not in

substantial dispute, to narrow the scope of disputed issues, and to facilitate the

presentation of cases to the trier of fact."  *T. Rowe Price Small-Cap Fund,* 174 F.R.D. at

42.


Upon review of the requests for admission and defendants' responses,

the Court directs Eurofins to respond to Spin Master's request to admit that bates

numbered documents identified in Requests for Admission ##64, 65, 66, 69, 70, 71, 72,

74, 76, 80, 84, 87, 88, 95, 100, 101, 102, 104, 112, 113, 114, 115, 117, 118, 119 and

120 are: (1) authentic; and (2) kept in the ordinary course of business.


**SO ORDERED.**


**DATED:      Buffalo, New York**
            **February  22, 2016**


_s/ H. Kenneth Schroeder, Jr._
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**